WELDON T. PETERS AND LINDA C. PETERS, ET AL.,[1]
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 16346-82, 39791-84,       Filed September 9, 1987.
35184-85, 38051-85,
38052-85, 40418-85,
43688-85, 43689-85,
43690-85,   1467-86,
1544-86, 10212-86.

---

[1]Cases of the following petitioners are consolidated herewith: John M. Kane and Geraldine M. Kane, docket No. 39791-84; Wilbur G. Robbins and Tula C. Robbins, docket No. 35184-85; J. Gordon Burch and Carolyn E. Burch, docket No. 38051-85; John W. Powers and Joan E. Powers, docket No. 38052-85; Weldon T. Peters and Linda C. Peters, docket No. 40418-85; Donal B. Hepworth and Verna J. Hepworth, docket No. 43688-85; John A. Magliana and Inger Magliana, docket No. 43689-85; Eugene H. Courtiss and Barbara Courtiss, docket No. 43690-85; Eugene C. Gwaltney and Nancy R. Gwaltney, docket No. 1467-86; Finis Morgan and Marjorie Morgan, docket No. 1544-86; and James M. Piccione and Myrna D. Piccione, docket No. 10212-86.

*Steven L. Paul* and *Leonard M. Singer*, for the petitioners.
*Anthony A. Falzone*, for the respondent.

NIMS, *Judge*: Respondent determined the following income tax deficiencies in these consolidated cases:

| Docket No. | Petitioners | Taxable years | Deficiency |
|---|---|---|---|
| 16346-82 | Weldon T. Peters | 1978 | $8,270,85 |
| 40418-85 | and Linda C. Peters | 1979 | 6,568.00 |
| 43688-85 | Donal B. Hepworth | 1978 | 6,402.00 |
| | and Verna J. Hepworth | 1979 | 8,873.00 |
| | | 1980 | 4,164.00 |
| 1467-86 | Eugene C. Gwaltney | 1978 | 12,149.64 |
| | and Nancy R. Gwaltney | 1979 | 3,890.24 |
| | | 1980 | 6,138.06 |
| 43690-85 | Eugene H. Courtiss | 1978 | 17,396.06 |
| | and Barbara Courtiss | 1979 | 31,045.81 |
| | | 1980 | 24,095.22 |
| 38051-85 | J. Gordon Burch | 1978 | 7,309.00 |
| | and Carolyn E. Burch | 1979 | 1,306.00 |
| | | 1980 | 4,627.00 |
| 35184-85 | Wilbur G. Robbins | 1978 | 20,372.00 |
| | and Tula C. Robbins | 1979 | 23,515.00 |
| 38052-85 | John W. Powers | 1978 | 7,562.00 |
| | and Joan E. Powers | 1979 | 8,203.00 |
| | | 1980 | 4,402.00 |
| 1544-86 | Finis Morgan | 1978 | 11,058.00 |
| | and Marjorie Morgan | 1979 | 8,778.00 |
| | | 1980 | 5,600.00 |
| 43689-85 | John A. Magliana | 1976 | 354.00 |
| | and Inger Magliana | 1978 | 48,187.00 |
| | | 1979 | 21,642.00 |
| | | 1980 | 52,639.00 |
| 39791-84 | John M. Kane | 1977 | 63.00 |
| | and Geraldine M. Kane | 1978 | 2,647.00 |
| | | 1979 | 4,097.00 |
| | | 1980 | 8,522.00 |
| 10212-86 | James M. Piccione | 1978 | 8,522.00 |
| | and Myrna D. Piccione | 1979 | 5,512.00 |

Respondent also determined, by deficiency notice or amended answer, that there is additional interest due under

former section 6621(d)[2] based upon substantial underpayments attributable to tax-motivated transactions.

As presented by the parties, the issues for decision are whether Touraine Co., a Massachusetts limited partnership, properly applied the half-year convention for depreciation purposes in 1978; whether petitioners were "at risk," as that term is used in section 465, for any amounts beyond their paid-in cash capital contributions on December 31 in each of the years 1978, 1979, and 1980; and whether petitioners have substantial underpayments attributable to tax-motivated transactions under section 6621(c).

Certain additional issues relating only to petitioners in docket No. 43689-85 (John A. Magliana and Inger Magliana) are to be subsequently briefed and considered in subsequent proceedings.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

At the time their petitions were filed, the residences of petitioners were as follows:

| Petitioners | States of residence |
| --- | --- |
| Weldon T. Peters and Linda C. Peters | Texas |
| Donal B. Hepworth and Verna J. Hepworth | Massachusetts |
| Eugene C. Gwaltney and Nancy R. Gwaltney | Alabama |
| Eugene H. Courtiss and Barbara Courtiss | Massachusetts |
| J. Gordon Burch and Carolyn E. Burch | Virginia |
| Wilbur G. Robbins and Tula C. Robbins | North Carolina |
| John W. Powers and Joan E. Powers | Massachusetts |
| Finis Morgan and Marjorie Morgan | Alabama |

---

[2]Unless otherwise noted, all section references are to sections of the Internal Revenue Code in effect for the years in question. All Rule references are to the Tax Court Rules of Practice and Procedure. By Pub. L. 99-514, 100 Stat. 2744, sec. 6621(d) was redesignated sec. 6621(c). For convenience, we hereinafter refer to this provision as sec. 6621(c).

| Petitioners | States of residence |
|---|---|
| John A. Magliana and Inger Magliana | Connecticut |
| John M. Kane and Geraldine M. Kane | Massachusetts |
| James M. Piccione and Myrna D. Piccione | Texas |

This dispute arose when respondent disallowed certain deductions claimed by petitioners as their distributive shares of losses and interest deductions from Touraine Co. (Touraine), a Massachusetts limited partnership, for 1978, 1979, and 1980. Petitioners are John M. Kane (Kane), a general partner of Touraine, nine individual limited partners (Messrs. Peters, Robbins, Powers, Hepworth, Gwaltney, Morgan, and Piccione and Drs. Courtiss and Burch, collectively referred to as the investor limited partners or petitioners) and John A. Magliana (Magliana), who claims to be taxable as a limited partner of Touraine by virtue of his interest in the JMK Leasing Trust, and their wives.

## The Transaction

The transaction which gives rise to the issues now before the Court is a leveraged net lease of equipment by Touraine, as lessor, to Datasaab Systems, Inc. (Datasaab), as lessee.

During the years in question, Kane was in the equipment lease packaging business—that is, he would find corporations such as Datasaab interested in leasing equipment, organize limited partnerships such as Touraine (or other ownership vehicles) to acquire and lease the equipment, and arrange financing for the acquisition of the equipment by the partnership. Such financing would typically consist of a loan from a bank or other lending institution secured by an assignment of the owner-lessor's lease to the corporate lessee plus capital invested by the owner-lessor.

Kane learned through Magliana, president of Datasaab, that Datasaab was interested in selling and leasing back some equipment. This equipment was used by Datasaab in the course of maintaining other equipment that Datasaab had manufactured and sold. Kane initially chose not to proceed with the transaction because Datasaab's financial

statements convinced him that it would be impossible to obtain a loan from a bank and, even if such a loan were obtained, the limited partners would be exposed to too great a risk that Datasaab would default on its lease obligations and that they would be called upon to make good on the loan.

In early fall 1978, Datasaab arranged for its parent, Datasaab AB, to guarantee its obligations in the proposed equipment lease transaction. During the years in question, 50 percent of Datasaab AB's stock was owned by Sweden and 50 percent was owned by Saab-Scania AB. Subsequently, by a Guarantee of Lease dated as of January 15, 1979, Datasaab AB guaranteed all of Datasaab's obligations as lessee to the extent of $2,250,000.

Based on the proffered guarantee, Kane decided to proceed with the transaction. In early November 1978, agreement was reached with Datasaab on the terms of the equipment lease. The lease was a net lease with a basic term of 7 years and a monthly rent of $35,124. The lease term was to commence on the date upon which Datasaab accepted the equipment. [3]

In addition to negotiating the terms of the lease with Datasaab, Kane sought a loan to finance the purchase of the equipment. The Chase Manhattan Bank (Chase Manhattan) "circled" for the loan; that is, it made a verbal commitment to make the loan at a specified rate and for a specified term subject only to approval of its loan committee.

In the middle of December 1978, when there was not enough time to find a replacement bank prior to the end of the year, Kane learned that Chase Manhattan was not going to make the loan. Datasaab was nevertheless anxious to consummate the transaction, and it agreed to finance Touraine's purchase of the equipment on a short-term basis. On or about December 22, 1978, Magliana informed Kane that he would find a bank to replace Chase Manhattan and that, while there was not time to close a loan with such bank by December 31, 1978, such a closing could occur after the bank's approval process was completed and the loan documentation prepared.

Pursuant to the arrangement with Datasaab, on December 31, 1978, the transaction was closed and Touraine purchased the equipment for a purchase price of $2,216,000 and leased it back to Datasaab. Touraine's basis in the equipment for depreciation purposes was $2,308,229. Datasaab was in possession of the equipment both before and after the December 31, 1978, closing.

After the closing, at the suggestion of Magliana, Kane approched Manufacturers Hanover Trust Co. (Manufacturers Hanover or the bank) to obtain financing to satisfy the note Touraine had given to Datasaab at the December 31, 1978, closing. Manufacturers Hanover agreed to make the loan, and the loan was closed on February 8, 1979. The entire proceeds of the Manufacturers Hanover loan were paid to Datasaab on account of the note Touraine had given on December 31. In addition, Datasaab received two checks totaling $81,393, which represented a portion of the proceeds of the sale of limited partnership interests in Touraine. Finally, Touraine also assigned to Datasaab 11 promissory notes in the aggregate principal amount of approximately $105,000 (the investor notes). The investor notes had been executed by the limited partners of Touraine in connection with their subscriptions for limited partnership interests in Touraine, were secured by letters of credit, and evidenced the obligations of the limited partners to make additional capital contributions to Touraine on June 15, 1979. Petitioners' obligations to make further capital contributions to Touraine were contingent upon Touraine's obtaining permanent financing. Petitioners' notes to Touraine provided that if Touraine failed to obtain permanent financing, then petitioners had the right to rescind the subscription agreements.

### The Touraine Limited Partnership

Touraine was formed on January 4, 1978, when Kane prepared Touraine's partnership agreement and filed its certificate of limited Partnership with the Secretary of State of the Commonwealth of Massachusetts. Kane and Leland B. Goldberg were listed as general partners and Kane was listed as the only limited partner. Neither Kane nor Goldberg ever made any capital contributions to Touraine.

Kane's intention was to use Touraine and the other partnerships which he formed at the same time as vehicles for equipment lease transactions during 1978. Consistent with this intention, Kane sought equipment lease opportunities and these efforts resulted in his learning about Datasaab. In October 1978, in connection with negotiating the lease with Datasaab, Kane selected Touraine as the owner-lessor from among the limited partnerships he had created on January 4, 1978. By early November 1978, Kane was able to project the benefits that an investor in Touraine might receive, and he prepared a private placement memorandum with respect to the offering of 20 limited partnership interests in Touraine (units). This memorandum described the proposed transaction, disclosed its risks, and provided exemplars of the documents which the investors would have to sign.

On December 29, 1978, there was filed with the Massachusetts secretary of state an amended and restated certificate of limited partnership which restated the entire partnership agreement in detail, added as limited partners all of the investors, and stated with particularity the exact nature of the subject transactions.

Schedule L, balance sheets, on Touraine's 1978 Partnership Return of Income (Form 1065) reflected the following:

| Assets | Beginning of taxable year | End of taxable year |
|---|---|---|
| Cash | 0 | $115,986 |
| Trade notes and accounts receivable | 0 | 154,014 |
| Buildings and other depreciable assets | 0 | 2,308,229 |
| (a) Less accumulated depreciation | 0 | − 346,234 |
| | | 1,961,995 |
| Intangible assets | | 1,000 |
| (a) Less accumulated amortization | 0 | − 0 |
| | | 1,000 |
| Total assets | 0 | 2,232,995 |
| *Liabilities and capital* | | |
| Accounts payable | 0 | 93,229 |
| Mortgages, notes, and bonds payable in 1 year or more | 0 | 2,206,000 |
| Partners' capital accounts | 0 | (66,234) |
| Total liabilities and capital | 0 | 2,232,995 |

Although Kane originally contemplated that the limited partners in Touraine would pay cash for their units, the

offering was amended to allow part of the payment for each unit to be a promissory note due June 15, 1979, secured by a letter of credit from the investor's bank.

By mid-to-late December 1978, subscriptions for 14 of the 20 units offered in Touraine had been received. However, the investors had subscribed based upon the understanding that Chase Manhattan was to finance the purchase of the equipment. When Chase Manhattan decided not to fund the loan and Datasaab agreed to provide interim financing, the investors were informed of the change in the transaction and given the right to rescind their subscriptions. At the same time each investor limited partner was informed of the amount of personal liability he would undertake for partnership indebtedness. None of the investors elected to rescind.

The partners were also informed that although total rental payment under the lease would be approximately $3 million, and the lessee might also incur substantial other costs, the guaranty of Datasaab AB would be limited to $2,250,000. Thus, if Datasaab failed to comply with the covenants of the lease, the amount that the partnership could recover from Datasaab AB under the lease guaranty might be less than the damages sustained by the partnership.

In connection with becoming limited partners, each of the investor limited partners, other than Peters, made a cash capital contribution of $5,684 per unit to Touraine on December 29, 1978, and executed and delivered an investor note in the amount of $8,106 per unit plus interest to the order of Touraine. Peters paid his entire capital contribution of $13,790 on December 29, 1978, and accordingly, did not execute an investor note. Neither Kane nor the JMK leasing trust paid any cash capital contribution nor did JMK leasing trust execute and deliver an investor note.

Kane would not have permitted the transaction to close if the investor notes had not been delivered to the brokerage company which had handled the sale of the partnership interests and were in that company's possession on or before December 29, 1978. On December 31, 1978, it was intended that the investor notes and the proceeds thereof be used to pay part of the cost of the equipment that Touraine had purchased from Datasaab.

All the investor notes were paid in full when they were due in June 1979. The investor limited partners and Magliana reported losses from Touraine of $17,052 per unit on their 1978 returns. For 1979, each investor limited partner and Magliana reported losses and interest deductions of $10,717 and $8,956 per unit, respectively. Dr. Courtiss also reported an additional amount of losses from Touraine equal to his interest deduction, which he concedes was a mathematical error.

The investor limited partners, for whom the year 1980 is before the Court, and Magliana, reported interest deductions from Touraine of $9,411 per unit for 1980. Dr. Courtiss also reported an equal amount of losses from Touraine, which he concedes was a mathematical error.

Kane reported losses from Touraine of $5,055 for 1978 and $3,202 for 1979 and interest deductions of $2,673 for 1979 and $2,809 for 1980.

### The At-Risk Agreements and Personal Guarantees

In connection with his subscription for units, each investor limited partner executed an at-risk agreement in the form that had been provided with the private placement memorandum. Thereafter, these at-risk agreements were dated and the dollar amounts for which the investor was to be at risk and the name of the addressees were filled in. Most of the at-risk agreements signed by petitioners were initially addressed to Chase Manhattan and some were readdressed to Datasaab and/or Manufacturers Hanover. These additions and alterations to the at-risk agreements were made consistent with authorization received from each investor limited partner. The investor limited partners intended, by execution of the at-risk agreements and by their authorization with respect to the completion of these agreements, to satisfy the at-risk requirements of section 465.

The Manufacturers Hanover loan commitment letter to Touraine, which was dated February 1, 1979, included as a condition precedent to closing the loan a requirement that there be delivered at closing "The Guarantee of the Limited Partners substantially in the form of Exhibit F hereto (the Limited Partners Guarantees)." Exhibit F is not attached to

the copy of the commitment letter introduced into evidence by petitioners.

Touraine's secured installment note (sometimes referred to as the note) delivered at the February 8, 1979, closing was by its terms nonrecourse as to Touraine and its partners, but provided that notwithstanding the nonrecourse provisions of the note "any partner of the Maker [Touraine] may at his option personally guarantee or co-sign as to any portion of this Note." Touraine's security agreement—chattel mortgage and assignment had similar provisions. The limited partners did not co-sign Touraine's secured installment note.

An additional condition to closing contained in the commitment letter was a requirement that the lessee's parent, Datasaab AB, guarantee the equipment lease.

At the February 8, 1979, closing, Touraine presented the at-risk agreements which had been executed by the investor limited partners in connection with their subscriptions. Although these at-risk agreements were not satisfactory to Manufacturers Hanover, it closed the loan and gave Touraine 90 days within which to provide suitable guarantees.

On February 8, 1979, Manufacturers Hanover loaned Touraine $2,029,229. Touraine's obligation to repay this loan was evidenced by the secured installment note signed by Kane on behalf of Touraine and dated February 8, 1979. Touraine's obligation to pay its secured installment note was secured by a security agreement—chattel mortgage and an assignment delivered to Manufacturers Hanover at the closing. With its security agreement—chattel mortgage, Touraine gave Manufacturers Hanover a security interest in the equipment subject to Touraine's equipment lease agreement, any future property at any time subject to the equipment lease agreement and the proceeds thereof. By its assignment, Touraine gave Manufacturers Hanover a security interest in Touraine's equipment lease agreement, its guarantee of lease from Datasaab AB, and all sums or damages due it under either the equipment lease agreement or guarantee of lease. In Touraine's assignment, it irrevocably authorized, instructed, and directed Datasaab and

Datasaab AB to make all payments directly to Manufacturers Hanover.

During 1979, personal guarantees for all petitioners, except Messrs. Powers, Magliana, and Kane, were executed and delivered to Manufacturers Hanover. By letter dated December 28, 1979, Manufacturers Hanover advised Kane that it had not received properly signed and dated guarantees for "the following partners of Touraine:"

James F. Ahern
John W. Powers
J.M.K. Leasing Trust
Leland B. Goldberg

The letter went on to say that:

As we must have all the partners' signed guarantees in order to complete our loan documentation, would you please see that these documents are forwarded to us at the soonest possible date.

By letter dated January 14, 1980, Kane mailed to Manufacturers Hanover a personal guarantee signed by him as trustee of the JMK leasing trust and the original at-risk agreement signed by Powers, which was readdressed to Manufacturers Hanover.

The form of a typical personal guarantee (with figures adjusted based upon the units acquired) signed by each of the investor limited partners included, among other things, the following provisions:

1. Effective as of December 31, 1978, the undersigned shall severally, with the other Limited Partners of the Partnership, guarantee the repayment of the purchase price of the equipment or the Secured Installment Note, which shall not have been paid by the Partnership when due, in the amount of $3,300 per Unit for the year ending December 31, 1978, which guarantee will increase by the following amounts each succeeding year, unless the undersigned elects, in a written notice to the General Partner of the Partnership on or before the first day of December of any calendar year, not to increase the amount of his personal guarantee over the amount guaranteed at the end of the prior calendar year.

| Year | Increase in personal guarantee | Total amount guaranteed |
|------|------|------|
| 1979 | $18,758 | $22,058 |
| 1980 | 8,880 | 30,938 |
| 1981 | 6,209 | 37,147 |
| 1982 | 4,738 | 41,885 |

* * * * * * *

3. The undersigned hereby empowers John Kane, the General Partner of the Partnership, to amend the Amended and Restated Agreement of Limited Partnership of the Partnership to provide that the Limited Partners of the Partnership are required to execute this Personal Guarantee and that any amounts paid by a Limited Partner pursuant to this Guarantee shall be considered an additional contribution to the Capital of the Partnership.

The yearly amounts used in the personal guarantees and the investor limited partners' option not to be liable under the personal guarantees were not subject to any negotiations between the limited partners, Touraine, and Manufacturers Hanover. The amounts appearing on the personal guarantees were calculated not to exceed the investor limited partners' projected distributive share of loss and investment interest expense deductions minus their capital contributions and in total were substantially less than the amount of Touraine's note to the bank.

Each of the investor limited partners was at risk within the meaning of section 465 for the amount of his cash contributions paid in 1978 and 1979, respectively.

## OPINION

In applying the half-year convention for depreciation purposes provided by section 1.167(a)-11(c)(2), Income Tax Regs., Touraine assumed the vintage of its depreciation account for the equipment leased to Datasaab to be 1978 and that, since its 1978 tax year consisted of 12 months, the second half of its 1978 tax year commenced on July 1 of that year. Touraine also assumed that it placed the equipment in service on December 31, 1978. Respondent takes issue with these assumptions.

In general, under the half-year convention depreciation for an ADR (the Class Life Asset Depreciation Range System) vintage account is determined by treating all property in the account as placed in service on the first day of the second half of the taxable year. Sec. 1.167(a)-11(c)(2)(iii), Income Tax Regs. Thus, if Touraine's first tax year began on January 4, 1978, as petitioners assert, Touraine would have been able to deduct a one-half calendar year's deprecia-

tion for property placed in service on the last day of the year.[3]

We think the question of whether Touraine properly applied the half-year convention to a full 12-month year for 1978 is controlled by our holding on this issue in *Torres v. Commissioner*, 88 T.C. 702 (1987), and that the answer must be "no." The operative facts in both cases are parallel on this issue.

In *Torres*, an entity called Regency was formed as a limited partnership at the end of 1973, with one general partner and one limited partner and no assets or liabilities. In November 1974, Regency entered into an equipment sale-leaseback transaction. Two days before the consummation of the transaction, the partnership agreement was amended, a different individual became sole general partner, and a group of new limited partners was added. The closing 1974 partnership return balance sheet showed the only assets to be $200 in contributions receivable and the equipment subject to the sale-leaseback. The only liability was the Regency note used to buy the equipment.

In the case before us, Kane formed Touraine on January 4, 1978, with himself and Goldberg as the general partners and himself as the only limited partner. Until December 29, 1978, Touraine had no assets or liabilities and conducted no business. The certificate of limited partnership was duly filed with the Massachusetts secretary of state and the entity was then put on the shelf for future use as a vehicle for an equipment lease transaction. It was activated on December 29, 1978, by the addition of the investor limited partners[4] and the filing of an amended and restated certificate of limited partnership with the secretary of state. This document restated in detail the entire partnership agreement and also stated with particularity the exact nature of the equipment lease transactions.

Touraine's closing 1978 balance sheet (on Form 1065, the 1978 Partnership Return of Income) reflected as Touraine's

---

[3]The income tax regulations now provide, in sec. 1.167(a)-11(c)(2)(iv)(c), that for certain purposes including the half-year convention, for property placed in service after Nov. 14, 1979 (with an exception not here relevant), the taxable year of the person placing the property in service does not include any month before the month in which the person begins engaging in a trade or business or holding depreciable property for the production of income.

[4]The parties stipulated that petitioners were admitted as limited partners to Touraine and made capital contributions on Dec. 29, 1978.

only assets the capital contributions of the partners, the purchased equipment, and intangible assets of $1,000, the nature of which is not stated.

The Form 1065 reflects no gross receipts during the year and depreciation in the amount of $346,234 as the only deduction.

In *Torres*, we held that for Federal tax purposes a partnership cannot exist unless the parties involved have a good-faith intent to presently conduct an enterprise with a business purpose. 88 T.C. at 736. We also held that on the *Torres* facts, the parties who established the limited partnership did not have a good-faith intention to presently conduct an enterprise with a business purpose prior to actually entering into the sale and leaseback transaction for which it was formed. 88 T.C. at 736.

We reached this result under section 761(a),[5] which defines the term "partnership," and *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949), which held that the existence of a partnership depends upon "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

There is no dispute that Touraine initially was formed as what might be called a "shelf partnership" for future use as an equipment sale-leaseback vehicle. Kane turned on the ignition on December 29, 1978, when he took the steps which we have outlined above. At that point Touraine acquired active partners, significant capital, and became positioned to close the equipment sale-leaseback transaction for which it was activated. Before then Kane and Goldberg did not intend to presently conduct any enterprise through Touraine. It follows that Touraine did not come into existence as a partnership until December 29, 1978, on which date the parties involved with Touraine, acting with a business purpose, intended to join together in the present

---

[5]Sec. 761(a) provides in relevant part:

SEC. 761. TERMS DEFINED.

(a) PARTNERSHIP—For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. * * *

conduct of the enterprise. Sec. 761(a); *Commissioner v. Culbertson, supra; Torres v. Commissioner, supra.*

The result we reach here is also consistent with our holding in *Sparks v. Commissioner,* 87 T.C. 1279 (1986), where we held that a limited partnership was formed for Federal tax purposes when the partners acquired their vested capital interests in the partnership and not when they subscribed to the offering pursuant to the offering memorandum. The subscriptions and activities of the general partner prior to the completion of the offering were preoperating activities. 87 T.C. at 1284. We apply the same principles here.

Respondent urges us to hold that the sale-leaseback equipment should be considered as purchased by Touraine and first placed in service on February 8, 1979, the closing date of the Manufacturers Hanover loan. Respondent appears to be arguing that the December 31, 1978, closing date lacked economic substance, citing such familiar cases as *Knetsch v. United States,* 364 U.S. 361 (1960), among others, in support of his position. We reject this argument since it is contradicted by the following stipulation by the parties:

On December 31, 1978, Touraine purchased the Equipment for a purchase price of $2,216,000 and owned the Equipment beginning on December 31, 1978, and throughout the years at issue.

Furthermore, the lease and certificate of acceptance were signed by Touraine and Datasaab on or before December 31, 1978, and Datasaab, the seller-lessee, was in possession of and used the equipment both before and after the date of its acquisition by Touraine. Consequently, there can be no question that the equipment was placed in service for Touraine's depreciation purposes, on Touraine's December 31, 1978, acquisition date.

While respondent has challenged the effectiveness of Touraine's election of the half-year convention (provided for by sec. 1.167(a)-11(c)(2), Income Tax Regs.) for its 1978 year, he does not question that Touraine complied with the formalities of making the election, as specified in section 1.167(a)-11(f), Income Tax Regs. Accordingly, we hold that Touraine validly elected the use of the half-year convention

for its tax year ending December 31, 1978, and that such year began on December 29, 1978.

We now take up the at-risk question under section 465. Respondent does not argue that Touraine's sale and leaseback should be wholly disregarded. In addition to the half-year convention question with which we have already dealt, respondent principally focuses his attention upon petitioners' at-risk posture over and above the cash invested by petitioners in 1978 and 1979.

Respondent concedes that petitioners were at risk to the following extent:

CASH CONTRIBUTED (NON-CUMULATIVELY) AS OF:

|  | 12/31/78 | 12/31/79 | 12/31/80 |
|---|---|---|---|
| Peters | $13,790 | - - - | - - - |
| Courtiss and Robbins | 11,368 | $16,212 | - - - |
| Kane | - - - | - - - | - - - |
| Others | 5,684 | 8,106 | - - - |

Since it appears that in every case except Kane's, petitioners were sufficiently at risk to cover their allocable shares of Touraine's depreciation deduction under our disposition of the half-year convention issue, the question of additional 1978 "at risk" under the at-risk agreements becomes moot.[6]

The deficiency notice in Kane's case determined that no 1978 deduction was allowable since Touraine's entire $346,234 depreciation was disallowed, or, in the alternative, it was determined that depreciation in excess of Kane's $4,100 at risk amount was disallowed. Thus, Kane may also deduct his pro rata share of Touraine's 1978 depreciation as redetermined herein.[7] Respondent did not amend his answer in Kane's case to claim an increased 1978 deficiency based upon a limitation of "at risk" to the amount of cash invested.

---

[6]The total 1978 Touraine depreciation deduction (the only 1978 deduction claimed) may be computed under our holding on the first issue as follows (assuming half days may be used in the computation, a question we need not here decide):

| | | |
|---|---|---|
| Total depreciation claimed (half year) | | $364,234 |
| Total days in redetermined tax year | | 3 |
| Days in half of redetermined year | | 1.5 |
| Claimed depreciation, per day ($346,234/182.5 days) | = | $1,897.17 |
| Total redetermined depreciation under half-year convention ($1,897.17 × 1.5 days) | = | $2,845.75 |

[7]Since Kane owned a 1.46 percent interest in Touraine at the end of 1978, his share of the redetermined depreciation is $41.55. ($2,845.75 × .0146).

The remaining question is whether the personal guarantees of petitioners placed petitioners at risk for 1979 and 1980 as claimed. We consider the following facts to be significant:

(1) The Manufacturers Hanover loan commitment letter required guarantees from the limited partners as a condition to closing, but the bank nevertheless closed the loan without the guarantees.

(2) The personal guarantees were, however, a post-closing requirement of Manufacturers Hanover, to be furnished within 90 days of closing. The bank was not scrupulous about enforcing compliance, but, shortly before the end of the year, inquired of Kane as to the whereabouts of four that were missing.

(3) The limited partners were advised in the private placement memorandum that they would be required to guarantee their pro rata share of a portion of the debt financing "in order to satisfy the 'at risk' requirement of the Tax Reform Act of 1976."

(4) Touraine's secured installment note was, by its terms, nonrecourse as to Touraine and its partners, but provided that nevertheless "any partner * * * may at his option personally guarantee or co-sign as to any portion of this Note."

(5) The partners gave themselves the right to increase the amounts of the guarantees annually, in specified amounts.

(6) The amounts of the guarantees were admitted by Kane to be the amounts of the projected tax losses less the capital contributions.

(7) The personal guarantees guaranteed only part of Touraine's debt to the bank.

We think it is also significant that the personal guarantees, having been duly executed by the limited partners and delivered to the bank, were legally enforceable against the guarantors. While respondent has challenged this, both in his opening statement at trial and on brief, at other times he argues that the personal guarantees are valid and enforceable. There are no words of mitigation against full enforceability in the documents themselves.

Respondent argues that (1) as guarantors of Manufacturers Hanover, petitioners were not personally liable within

the meaning of section 465(b)(2)(A) since they had the right of reimbursement against Touraine; (2) petitioners could look to Datasaab AB for reimbursement through the guarantee of lease; (3) based on the economics of the transaction, petitioners were protected against loss through a "stop loss agreement or other similar arrangements," citing section 465(b)(4); and (4) the guarantees were shams without business purpose and lacked economic substance.

Petitioners argue that (1) lessors such as petitioners may be at risk notwithstanding the obligations of the lessee under a typical net lease; (2) petitioners were personally liable under the personal guarantees; (3) the personal guarantees were a condition precedent to the bank loan; (4) it is immaterial that no one expected the personal guarantees to be called because of the lessee's credit worthiness; (5) since the personal guarantees expressly state that any payment thereunder is to be treated as a contribution to capital, the payor would not be entitled to any right of reimbursement; and (6) under the transaction as structured, there is no primary obligor, so that each petitioner has the "ultimate liability" insofar as the amount of his guarantee is concerned.

Essentially, petitioners rely upon our opinion in *Abramson v. Commissioner*, 86 T.C. 360 (1986), and respondent relies on our opinion in *Brand v. Commissioner*, 81 T.C. 821 (1983). Section 465(a) limits loss deductions of individuals, among others, engaged in certain activities to the amounts as to which the individual is at risk at the close of the taxable year. Section 465(c)(1)(C) includes "leasing any section 1245 property" among the activities to which section 465(a) refers. (Sec. 1245 property, stated generally, is depreciable personal property.) Under section 465(b)(1)(B), a taxpayer is at risk as to borrowed amounts for which he is personally liable, but under section 465 (b)(4) he is not at risk with respect to amounts protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The question upon which we are now focusing is whether the personal guarantee of each petitioner who provided one to Manufacturers Hanover falls within the ambit of "other similar arrangements."

We have previously held that when Congress originally enacted section 465 in 1976, the legislative intent was that a taxpayer is not to be considered at risk for any amount borrowed if he is protected against economic loss. *Brand v. Commissioner*, 81 T.C. 821, 828 (1983), citing S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 85. We quoted the Senate report:

Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or *if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person.* [1976-3 C.B. (Vol. 3) 87; emphasis added.]

The personal guarantee agreements do not specify the applicable State law under which they are to be enforced. In *Brand*, we noted that generally, under common law, a guaranty agreement is governed by the law of the State where it was executed unless it is intended to take place elsewhere. 81 T.C. at 828 n. 12. The personal guarantee agreements guarantee both the payment of the purchase price of the equipment and the secured promissory note. Both the bill of sale and certificate of acceptance by which Touraine acquired the equipment are silent as to applicable State law or place of execution, but the secured promissory note indicates that Manufacturers Hanover may exercise its remedies under the New York Uniform Commercial Code (U.C.C.). Since the personal guarantees are collateral to the secured promissory note, we deem it appropriate to proceed upon the assumption that the Court would apply New York law.

The New York U.C.C. (as, indeed, does the Massachusetts U.C.C.) provides in sec. 3-415(5) that "An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party." The New York U.C.C. further provides, in sec. 3-416(3), that "Words of guaranty which do not otherwise specify guarantee payment." The personal guarantee agreements use words of guaranty, and "do not otherwise specify" except to limit the dollar amount of each respective signatory's liability. Without question, then, petitioners are guarantors under the New York U.C.C.

In *Brand*, we held that "Since a guarantor is entitled to reimbursement from the primary obligor, it is clear that Congress did not intend that a guarantor of a loan is personally liable for repayment of the loan within the meaning of section 465(b)(2)(A)." 81 T.C. at 828.[8]

As previously stated, petitioners place heavy reliance upon *Abramson v. Commissioner*, 86 T.C. 360 (1986). Each taxpayer in *Abramson* entered into a "so-called guarantee agreement" whereby each taxpayer as a limited partner would have personal liability for payment of a pro rata share, and only a pro rata share, of the entire nonrecourse note when due. 86 T.C. at 366-367. In a footnote we observed that although the terms "guarantee" or "guarantor" were used, neither term was used in its conventional sense. 86 T.C. at 366 n. 10.

We further observed in *Abramson* that under the agreements, the limited partners were primarily and ultimately liable because neither the partnership nor its general assets (other than the motion picture film in question) was subject to the nonrecourse obligation. Thus, there was no primary obligor against whom the taxpayers would have had a right of subrogation. There was also testimony in *Abramson* that the arrangement of an apparently nonrecourse promissory note qualified by a limited recourse agreement is common practice in New Jersey. We held that "This case involves an obligation on which each partner, general and limited, is directly liable to the seller of the film. The nonrecourse form of the obligation was used to avoid joint and several liability among the partners, and the 'guarantee' was simply the means by which each partner agreed with the seller to be personally liable for a specific portion of the debt." 86 T.C. at 375-376.

This is not the situation in the case before us. The guarantees do not extend to the entire debt, but only at most to the amount of petitioners' expected deductions, less their cash contributions. We also think Manufacturers Hanover would be taken aback to be told that Touraine was not the primary obligor on the secured promissory note. It

---

[8]In *Brand v. Commissioner*, 81 T.C. 821 (1983), we applied the law of Idaho and Nevada in construing the guaranty agreement there under consideration. The Idaho and Nevada law has the same impact in this context as does the New York U.C.C.

was, on the face of the note, the only obligor. Far from being primary and direct obligations of the partners to pay the entire debt, the personal guarantees, having in effect been voluntarily given, were at most lagniappe as far as Manufacturers Hanover was concerned.

On brief petitioners argue that because the personal guarantees empower Kane to further amend the partnership agreement to provide that any amounts paid pursuant to the guaranty "shall be considered an additional contribution" to partnership capital, the payor would not be entitled to any right of reimbursement. At trial, Kane admitted that no such amendment had ever been made. Even if it had been, there is no basis for inferring a waiver by petitioners as guarantors of their subrogation rights against Touraine. Any contribution to capital would be merely the bottom line result after any subrogation effort had failed.

It might be argued that a guarantor's right of subrogation against the primary obligor is a mere formalism upon which one ought not rely in determining tax consequences of a transaction such as this. Petitioners' chances of recovery might indeed be remote. One might confidently say this of most guarantor-subrogation cases, but the U.C.C. provides the right of subrogation nevertheless.

By the same token, one might also say that the likelihood of petitioners' having to make good under their personal guarantees is remote, given the impressive security provided by Datasaab AB's lease guarantee. Petitioners themselves chose the device of guarantees, which for all intents and purposes were gratuitously given, as their means of making an end run around the at risk rules of section 465. They may not now be selective as to which parts of the guarantees are to be legally effective and which are not.

We hold that because of their right, as guarantors, of subrogation against Touraine, petitioners were not personally liable for the repayment of any part of the obligation which they guaranteed. Consequently, they were not at risk in the sense contemplated by section 465(c)(2). *Brand v. Commissioner*, 81 T.C. 821 (1983).

Respondent determined that petitioners are liable for additional interest on substantial underpayments attributable to tax-motivated transactions under section 6621(c).

Section 6621(c)(3)(A) includes under "tax motivated transactions" any loss disallowed by reason of section 465(a) (sec. 6621(c)(3)(A)(ii)) and any use of an accounting method specified in regulations as a use which may result in a substantial distortion of income for any period (sec. 6621(c)(3)(A)(iv)).

Section 6621(c)(4) directs the Tax Court to determine the portion, if any, of the deficiency which is a substantial underpayment attributable to tax-motivated transactions.

Since the entire deficiencies for 1979 and 1980 result from losses disallowed by reason of section 465(a), petitioners are liable for increased interest on the underpayments for those years.

The deficiencies for 1978 are another matter. Section 6621(c)(3)(A)(iv), as noted, provides that the term "tax motivated transaction" means, among other things, any use of an accounting method specified in regulations as a use which may result in a substantial distortion of income for any period. Sec. 6621(c)(3)(A)(iv). On December 24, 1984, respondent promulgated temporary regulations under section 6621(c). Sec. 301.6621-2T, Temporary Admin. & Proced. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). These regulations written in question and answer form provide, in part, as follows:

Q-3. What accounting methods may result in a substantial distortion of income for any period under A-2(5) of this section?

A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment:

   *  *  *  *  *  *  *

(9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) * * * (ii) * * * or (iii) the deduction resulted in a material distortion of income (see, e.g., Rev. Rul. 79-229, 1979-2 C.B. 210).

Respondent argues that Touraine is a cash basis taxpayer and that its use of the half-year convention results in a material distortion of income. However, regardless of whether the half-year convention under ADR may be called

an accounting method for purposes of section 6621(c)(3)(A)(iv), respondent has not challenged Touraine's right to use the half-year convention but only the period as to which its use became effective. Consequently, respondent may not now argue, so as to impose the additional interest on substantial underpayments for 1978, that Touraine has used an improper accounting method.

To reflect the foregoing,

*Decisions will be entered under Rule 155 in docket Nos. 16346-82, 39791-84, 35184-85, 38051-85, 38052-85, 40418-85, 43688-85, 43690-85, 1467-86, 1544-86, and 10212-86.*

*An appropriate order will be issued in docket No. 43689-85.*