LOUIS R. M. DEL GUERCIO AND PAULA M. H. DEL GUERCIO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Del Guercio v. Commissioner
Docket Nos. 41442-85; 13824-86
United States Tax Court
T.C. Memo 1989-354; 1989 Tax Ct. Memo LEXIS 353; 57 T.C.M. (CCH) 1023; T.C.M. (RIA) 89354; July 24, 1989
*353 P purchased a crane from his brother-in-law for consideration consisting of $ 20,000 cash and $ 80,000 of nonrecourse indebtedness. P's brother-in-law had purchased the crane six months earlier from an unrelated third party for $ 20,000. P's objective in purchasing the crane was to incur tax benefits in large disproportion to his economic investment. The crane was never leased and generated no income. P has made no principal or interest payment on the $ 80,000 of nonrecourse indebtedness. Held, P did not purchase the crane with the objective of engaging in the activity of crane leasing for profit under I.R.C. section 183. Sutton v. Commissioner, 84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), followed. Held further, Ps' basis in the crane is $ 20,000. Held further, Ps are liable for the valuation overstatement addition to tax imposed by I.R.C. section 6659 for each of the taxable years 1981 and 1982. Held further, Ps are liable for the addition to interest under I.R.C. section 6621(c) resulting from substantial underpayments attributed to a tax-motivated *354 transaction for each of the taxable years 1980 and 1981. Louis R. M. Del Guercio, pro se. Gary D. Borek, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined the following deficiencies and additions to petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Section 6659
1980
$ 23,011.00
--
1981
8,667.00
$ 2,600.00
1982
5,612.96
1,683.89
Respondent further determined additions to *356 tax for the taxable years 1980 and 1981 under section 6621(c) although these amounts, if any, cannot be determined until completion of this case. (Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) Concessions having been made, the issues remaining for decision are (1) whether Louis R. M. Del Guercio (hereinafter petitioner or Dr. Del Guercio) purchased a crane with the requisite profit objective under section 183; (2) petitioners' basis in the crane; (3) whether petitioners are liable for valuation overstatement additions to tax under section 6659; and (4) whether petitioners are liable for additions to interest imposed by section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners timely filed joint returns for the taxable years 1980, 1981 and 1982. Petitioners resided in Larchmont, New York, when they filed their petitions. During the years in issue, petitioner was chairman of the department *357 of surgery at the New York Medical College. Petitioner was also a founder and chairman of the board of directors of Daltex Medical Sciences, Inc. (Daltex), a publicly-held company. On or about November 8, 1978, petitioner's brother-in-law, Ben Dundee (Dundee), purchased a coal-washing plant (the plant) in Trevorton, Pennsylvania. Trevorton is located in the anthracite coal region of central Pennsylvania. Dundee used a corporation that he owned, the Croftshaw Corporation (Croftshaw), to purchase the plant from the Churchill Coal Corporation (Churchill). The plant was designed to wash rocks and debris away from what was otherwise salable coal. The plant was located near gob piles or "mountains" of small grade anthracite coal that had been discarded over years of underground mining. Dundee, a licensed professional engineer with a masters degree in chemical engineering from the College of the City of New York, had been in the engineering and energy businesses for his entire professional career. He estimated that the gob piles near the plant contained 30 million tons of coal, of which approximately 50 percent or 15 million tons was salable. Dundee further estimated the potential *358 value of the 15 million tons, at $ 20 per ton, to be $ 300 million. Dundee purchased the plant during a period of national concern over America's dependence on foreign oil and he anticipated the resurgence of domestic coal as a viable energy source. Dundee's anticipation was reinforced when President Carter signed the National Energy Act into law on November 9, 1978. The National Energy Act was comprised of the following five acts: (1) the National Energy Conservation Policy Act of 1978; (2) the Powerplant and Industrial Fuel Use Act of 1978; (3) the Public Utilities Regulatory Policy Act; (4) the Natural Gas Policy Act of 1978; and (5) the Energy Tax Act of 1978. A central theme running throughout the National Energy Act was the aim of reducing America's dependence on foreign oil by increasing the use of domestic coal. In July of 1979, Dundee purchased a used 1959 Bay City 40-ton crane from an unrelated individual for $ 20,000. The crane was mounted on a truck and located in Shamokin, Pennsylvania, approximately 10 miles from the plant in Trevorton. Dundee planned to use the crane in conjunction with the plant's coal-washing operations. During the summer of 1979, petitioners' *359 son, Paul Del Guercio, worked for Dundee in Shamokin. On December 18, 1979, Dundee wrote the following letter concerning the crane to Larry Gordon of Churchill: Dear Larry: In accordance with your request, I visited Shamokin, Pa. on Dec. 17, 1979 in order to get a realistic appraisal of the Bay City Crane, Serial No. 8596. The equipment is a 40 Ton Crane mounted on a conventional truck, powered with Waukashau gas engines both in the carrier and crane. Included is a 100 ft. Boom and 50 ft. Gib. In addition there is 750 ft. of 3/4" (6 part Hoist Line). I interviewed Mr. John Madero, foreman and Don Hodiak in charge of the Strippings. Both of these men are experienced and highly qualified in this field. In addition they have spent time in the reconditioning of the machine. Among other things they have installed a new lining on the friction hoist. It is their considered opinion that the machine has a fair value of $ 50,000. I do not believe you can rent this type of equipment for less than $ 1000 per day. On January 15, 1980, petitioner purchased the crane from Dundee and executed a bill of sale. The bill of sale stated that the crane's purchase price was $ 100,000, *360 the consideration to consist of a $ 20,000 cash down payment and a nonrecourse promissory note in the amount of $ 80,000. On the same day, petitioner executed a security agreement giving Dundee an $ 80,000 security interest in the crane. The security agreement provided that the $ 80,000 would be paid in four annual payments of $ 20,000 plus accrued interest at an annual rate of 6 percent, with the first payment to be on January 15, 1981. Also on January 15, 1980, petitioner entered into a management agreement with the Anthracite Corporation of America (Anthracite), a Pennsylvania corporation owned by Dundee. The management agreement provided that Anthracite would service the crane and lease it out on a daily basis in exchange for 50 percent of all leasing fees in excess of $ 23,087.32 per year. On June 10, 1980, petitioner wrote a check to Dundee in payment of the $ 20,000 down payment. On the same day, the president of Valley Forge Coal Corporation wrote the following letter to a Mr. Glushak (Glushak) of Anthracite: Dear Mr. Glushak: We are unable to proceed with our plans to rent the Bay City Crane. As mentioned previously, we had entered into a contract to dismantle *361 a complete Coal Washing Plant and re-erect at another location 50 miles away. We estimated 50 days use for the Crane at $ 700 / D during 1980 & 1981. However the above mentioned contract is in litigation at the present and we have abandoned the project. On June 20, 1980, Glushak wrote the following letter to petitioner: Dear Dr. Del Guercio: Enclosed is an advice from Valley Forge Coal Company which is self explanatory. Unfortunately, I have been advised that conditions in the coal region where the Bay City Crane is based are at this time poor and depressed. Regrettably, therefore, Anthracite Corporation has been unable to exploit or put your crane to use. Hopefully, circumstances will improve in the future. Dundee submitted petitioner's $ 20,000 check for payment on June 23, 1980. Two days later, petitioner wrote the following letter to Dundee: I would appreciate your making some adjustments in my schedule of payments. I have been advised that economic conditions in the coal area where the crane would be normally utilized is at a very low state and very little likelihood of income being generated in the near future. On July 18, 1980, Dundee responded as follows: *362 Dear Dr. Del Guercio: Thank you for yours of the 25th June 1980. I can well appreciate the conditions in the coal area where your crane is based. I am sure that economic conditions will improve at some time and I will be glad to revise your payment schedule as follows: 1. Extend next mortgage payment to no later than 1985 2. Interest to be increased to 9% and next payment no later than Jan. 1983 3. Final payment no later than Jan. 1990. On July 20, 1980, petitioner signed the above-quoted letter and added the phrase "Terms of agreement accepted." As of the trial of this case on January 14, 1988, petitioner had not made any principal or interest payments on the $ 80,000. Neither Anthracite nor petitioner were able to lease the crane. The crane generated no income. Petitioners claimed the following depreciation deductions and investment tax credit (ITC) for the taxable years 1980, 1981 and 1982 from the crane-leasing activity: Year
ITC
Depreciation Deductions
1980
$ 10,000
$ 25,429 1981
--
15,980
1982
--
12,555
TOTAL
$ 53,964 During the years in issue, petitioners' taxable income (before claiming the depreciation deductions *363 in issue) was as follows: Year
Taxable Income
1980
$ 139,327
1981
108,349
1982
61,771
In his statutory notices of deficiency, respondent denied petitioners' claimed depreciation deductions and ITC under the authority of section 183. OPINION
Section 183 generally provides that a taxpayer must engage in an activity with the objective of making a profit in order to fully deduct expenses under either section 162 or section 212 and to claim investment credits under section 38.[1]Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Pike v. Commissioner, 78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). A reasonable expectation of profit is not required. However, the taxpayer's profit objective must be bona fide. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *364 Petitioners assert that Dr. Del Guercio possessed the requisite bona fide profit objective within the meaning of section 183. Respondent asserts that Dr. Del Guercio's crane-leasing activity was not founded on a bona fide profit objective because it was carried on solely for the purpose of securing tax benefits. Accordingly, respondent asserts that he properly disallowed petitioners' claimed ITC and limited petitioners' claimed depreciation deductions to the extent such are permitted under section 183(b). We agree with respondent. The issue of whether a taxpayer engages in an activity with a bona fide profit objective under section 183 is one of fact to be resolved under all of the facts and circumstances. Takahashi v. Commissioner, 87 T.C. 126, 133 (1986) (citing Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981)). The burden of proving the requisite objective is on petitioners. Sabelis v. Commissioner, 37 T.C. 1058, 1062 (1962); Rule 142(a). Section 183 allows deductions for ordinary and necessary expenses arising from an activity not engaged in for profit only to the extent of gross income derived from such activity, *365 less the amount of those deductions which are allowable regardless of whether the activity is engaged in for profit. Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is "not engaged in for profit." These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Petitioner contends that he would not have purchased the crane unless he intended to make an economic profit. We must, nevertheless, give greater weight to objective factors than to petitioner's mere statement of intent. Section 1.183-2(a), Income Tax Regs. Accordingly, for the reasons *366 enumerated below, we are convinced that petitioner intended to make a tax profit, not an economic profit, when he purchased the crane. First, we do not believe that petitioner would have agreed to pay $ 100,000 for the crane if he had been concerned with the economic profitability of the investment. The record contains no evidence indicating that petitioner actually and honestly believed the economic potential (i.e., lease income projections) of the crane would support a $ 100,000 purchase price. Petitioner never attempted to obtain any projection as to what leasing income the crane would need to generate to support the $ 100,000 purchase price. Petitioners contend on brief that a letter dated June 10, 1980, from the president of Valley Forge Coal Corporation to Glushak of Anthracite provides such evidence. We do not agree. First, the letter is dated June 10, 1980, almost five months after petitioner purchased the crane. Thus, it provides no evidence of petitioner's bona fide profit objective as of the date of purchase on January 15, 1980. Second, the letter indicates that the crane could be expected to lease at a daily rate of $ 700. Petitioners assert on brief that "any *367 piece of equipment which can be rented for $ 700/day has a fair market value of at least $ 100,000." This assertion is not supported by the record. On December 18, 1979, Dundee wrote a letter stating that two experienced coal men estimated that the crane could be leased at a daily rate of $ 1,000, which would indicate a fair market value of $ 50,000. Petitioners' assertion that the leasing income could support a $ 100,000 purchase price is facially inconsistent with the evidence that they have introduced. Petitioners further assert that Dr. Del Guercio relied on reports of their son detailing the optimism in the coal fields, various magazine articles signaling the imminent coal boom and on President Carter's resolve to reduce America's dependence on foreign oil. Petitioners' assertions, although arguably correct in the abstract, miss the mark. We do not question Dr. Del Guercio's belief as to whether the coal industry would expand, but rather whether he purchased the crane for $ 100,000 with the objective of making a profit. Even if we assume that Dr. Del Guercio expected the coal industry to experience tremendous growth, we are not persuaded that he believed the crane would *368 generate sufficient profits to justify the $ 100,000 purchase price. Petitioners have provided us with no evidence that prior to Dr. Del Guercio's purchase of the crane on January 15, 1980, he made any attempt to determine the crane's economic profitability. Dundee had purchased the crane from an unrelated third party six months earlier for $ 20,000. Petitioners offered no plausible explanation as to how the crane might have appreciated 400 percent in the six months preceding Dr. Del Guercio's purchase and allegedly doubled in value from December 18, 1979, to January 15, 1980. Conversely, a $ 100,000 basis in the crane would produce an immediate and substantial tax profit. Petitioner's $ 20,000 cash investment would yield an investment tax credit of $ 10,000 in 1980 and total depreciation deductions of $ 53,964 for 1980, 1981 and 1982. Petitioners' taxable income before depreciation substantially exceeded $ 60,000 in each of the years in issue and as the following table shows, the marginal rate on taxable income in excess of $ 60,000 equaled or exceeded 50 percent (49 percent on the $ 60,000 - $ 85,600 bracket for 1982) for the years in issue: Joint Return
Taxable Income
1980 and 1981
1982
Over $ 60,000 -  85,600
54 percent
49 percent
Over   85,600 - 109,400
59 percent
50 percent
Over  109,400 - 162,400
64 percent
50 percent
Over  162,400 - 215,400
68 percent
50 percent
Over  215,400
70 percent
50 percent
*369 Thus, by hypothesizing a 50-percent effective rate for 1980 and 1981, and 49 percent for 1982, petitioners would realize tax benefits of approximately $ 36,856 [$ 10,000 + (.50 X $ 25,429) + (.50 X $ 15,980) + (.49 X $ 12,555)]. For 1980 alone (the year in which petitioner bought the crane), petitioners stood to save in taxes at least $ 22,714 [$ 10,000 + (.50 X $ 25,429)], i.e., more than his $ 20,000 cash investment. Therefore, in the first three years of their investment, petitioners anticipated tax savings in excess of 180 percent of the amount of their $ 20,000 cash investment. Moreover, petitioner manufactured the $ 100,000 basis and corresponding tax benefits through the use of large nonrecourse financing. Petitioner's cash "down payment" of $ 20,000 exactly equaled the amount Dundee had paid for the crane six months earlier. Petitioner financed the remaining $ 80,000 with a security interest in the crane. Petitioner's financing of 80 percent of the purchase price with nonrecourse indebtedness, in combination with the inflated purchase price, provides strong evidence that the lure of tax profit, and not economic profit, motivated his purchase of the crane. Sutton v. Commissioner, 84 T.C. 210, 224 (1985), *370 affd. per curiam 788 F.2d 695 (11th Cir. 1986). Petitioners further contend that (1) Dr. Del Guercio operated the crane in a business-like fashion by hiring Dundee's corporation, Anthracite, to manage the crane-leasing activity; and (2) Dr. Del Guercio's involvement in Daltex reflects his business acumen and general ability to engage in a crane-leasing activity for profit. We do not question Dr. Del Guercio's business ability or that he could successfully operate a crane-leasing activity if he were so inclined. However, the record provides no indication that he ever intended to apply his business acumen in the instant case. Anthracite never leased the crane. Dr. Del Guercio never attempted to employ a different management company or to lease the crane himself. Common sense would indicate that if petitioner intended to make a profit he would have driven the crane, which was mounted on a truck, or hired someone to drive it to a less economically depressed area where it would have stood a greater probability of being leased. The record contains no indication that Dr. Del Guercio purchased the crane with the bona fide objective of making an economic profit. To the *371 contrary, there is every indication that he had the objective of securing tax benefits far exceeding his cash outlay. Section 6659
Respondent determined that petitioners are liable for additions to tax resulting from their valuation overstatement of the crane for the taxable years 1981 and 1982 under section 6659. A valuation overstatement has occurred "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Section 6659(c). Petitioners reported a basis in the crane of $ 100,000 and claimed corresponding depreciation deductions and investment tax credits. Dr. Del Guercio purchased the crane from Dundee for consideration consisting of $ 20,000 cash and $ 80,000 of nonrecourse indebtedness. Nonrecourse indebtedness is generally includable in a purchaser's basis. Crane v. Commissioner, 331 U.S. 1 (1947); Mayerson v. Commissioner, 47 T.C. 340, 352 (1966). However, such indebtedness will be disregarded where the purchaser acquires no equity by making payments and, therefore, has *372 no economic incentive to pay off the note. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). As discussed previously, Dundee purchased the crane six months earlier for $ 20,000. Petitioners have failed to explain how the crane allegedly appreciated 400 percent in the ensuing six months. Dr. Del Guercio's $ 20,000 cash "down payment" exactly equaled the amount which Dundee had paid for the crane. This evidence provides a strong indication of the crane's fair market value at the time of purchase. Dr. Del Guercio had no economic incentive to pay off the $ 80,000 of nonrecourse indebtedness because there was no remaining equity in the crane for him to acquire after he had paid Dundee the $ 20,000. Accordingly, we find the correct basis to be $ 20,000. Additionally, we note that as of the date of trial, approximately eight years after purchasing the crane, petitioner had yet to make a principal or interest payment on the $ 80,000 of nonrecourse indebtedness. Such nonpayment further indicates that the $ 80,000 of nonrecourse indebtedness was merely contingent upon Anthracite's ability to lease the *373 crane and had no economic significance at the time of purchase. Since the claimed basis of $ 100,000 is more than 150 percent of the correct basis as determined, $ 20,000, a valuation overstatement within the meaning of section 6659(c) has occurred in each of the years 1980, 1981 and 1982. Helba v. Commissioner, 87 T.C. 983, 1014-1015 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). We note, however, that respondent does not assert that the section 6659(c) addition applies for the taxable year 1980. Section 6621(c)
Respondent contends that petitioners are liable for additional interest under section 6621(c) because their entire deficiencies for the taxable years 1980, 1981 and 1982 represent substantial underpayments attributable to a tax-motivated transaction. (Section 6621(d) was redesignated as section 6621(c) by the Tax Reform Act of 1986, 100 Stat. 2744. See Pub. L. 99-514, sections 1511(c)(1)(A)-(C).) In the deficiency notice for 1980 and 1981, respondent determined that section 6621(c) was applicable for those taxable years. However, he did not make such a determination in the deficiency notice for 1982, nor did *374 he raise the issue in his answer or by motion at any time to amend his answer. On January 10, 1985, then Chief Judge Howard A. Dawson, Jr., announced procedural guidelines for respondent to follow in introducing the section 6621(c) addition in the post-answer stage of litigation. See Law v. Commissioner, 84 T.C. 985, 991 (1985). These guidelines established that in order to avoid filing a written motion respondent must give adequate and timely written notice to the taxpayer or his counsel of respondent's intention to claim additional interest under section 6621(c). If such notice is given, the Court will then permit respondent to move to amend his answer at trial. Respondent made no attempt to comply with these guidelines in the instant case. Respondent has not moved the Court at any time to amend his answer with regard to the applicability of section 6621(c) for 1982, which was the proper course for him to have taken. Rule 31(a). Respondent raised this issue for the first time on brief by stating in a table of the deficiencies determined by respondent that the section 6621(c) addition had been determined for 1982. This was an incorrect representation, no *375 doubt inadvertent. In discussing the issue in his brief, respondent also does not differentiate among the years in issue as to the section 6621(c) addition. Rule 31(a) states that the purpose of the pleading is to give the parties and the Court fair notice of the matters in controversy, among other things. Briefs are not pleadings. While it might be highly unlikely that petitioners could successfully rebut respondent's assertion of section 6621(c) for 1982, fairness dictates that petitioners be given an opportunity to do so in response to a proper pleading of the issue. Notwithstanding dicta in Law v. Commissioner, supra at 992-993, which may suggest that a contrary result should obtain in a factual context such as that of the case before us, we believe that at a minimum the matter remains within the sound discretion of the Court, and in this case we decline to apply section 6621(c) sua sponte for 1982. Cf. Johnson v. Commissioner, 85 T.C. 469, 482-484 (1985), where we applied section 6621(c) sua sponte in a case involving the taxpayers' "blatant misuse of the charitable donation provisions." 85 T.C. at 483. Respondent has, *376 however, properly raised the applicability of section 6621(c) for 1980 and 1981. Section 6621(c) applies to interest accruing after December 31, 1984, although the sale in the instant case was consummated prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c) provides for an increased rate of interest for substantial underpayments attributed to a tax-motivated transaction. Petitioners' underpayments in each of the taxable years 1980 and 1981 exceeded $ 1,000 and therefore are defined as "substantial underpayments." Section 6621(c)(2). These substantial underpayments are by definition attributed to a tax-motivated transaction because they resulted from a valuation overstatement (within the meaning of section 6659(c)) in each of the years 1980 and 1981. Section 6621(c)(3)(A)(i). See also section 301.6621-2T, Q-4 and A-4(1), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), which provides that deductions disallowed under section 183 are considered to be attributable to tax-motivated transactions. *377 We find petitioners liable for increased interest on their substantial underpayments of tax in 1980 and 1981, which are attributed to a tax-motivated transaction under section 6621(c). Peters v. Commissioner, 89 T.C. 423, 443-444 (1987). To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Section 183(a) states: (a) GENERAL RULE. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.↩