HUGH M. BRAND AND ELIZABETH G. BRAND, ET·AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 11106–80, 12326–80,   Filed October 31,1983.
12330–80, 12331–80,
9430–81, 10022–81,
11894–81, 16923–81,
17393–81.

---

[1]Cases of the following petitioners are consolidated herewith: Foster W. Polley and Reva B. Polley, docket No. 12326–80; William B. Simpson and Katherine Simpson, docket No. 12330–80; Louis J. Hendrickson and Phyllis M. Hendrickson, docket No. 12331–80; Kenneth L. Cameron and Debra C. Cameron, docket No. 9430–81; Michael T. Michelas, docket No. 10022–81; Raymond Heard and Sharlene Heard, docket No. 11894–81; Charles M. Ortiz and Bonita K. Ortiz, docket No. 16923–81; and Estate of Wilmer Allen and Melba Allen, docket No. 17393–81.

*James A. Ririe,* for the petitioners.
*Dan A. Lisonbee,* for the respondent.

OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

|  | Year | Deficiency |
|---|---|---|
| Hugh M. Brand and Elizabeth G. Brand | 1976 | $439 |
| Foster W. Polley and Reva B. Polley | 1976 | 4,513 |
| William B. Simpson and Katherine Simpson | 1976 | 1,883 |
| Louis J. Hendrickson and Phyllis M. Hendrickson | 1976 | 11,045 |
| Kenneth L. Cameron and Debra C. Cameron | 1976 | 1,487 |
|  | 1977 | 180 |
|  | 1978 | 44 |
| Michael T. Michelas | 1976 | 1,610 |
|  | 1977 | 451 |
|  | 1978 | 694 |
| Raymond Heard and Sharlene Heard | 1976 | 3,730 |
|  | 1977 | 714 |
|  | 1978 | 208 |
| Charles M. Ortiz and Bonita K. Ortiz | 1977 | 2,387 |
| Estate of Wilmer Allen and Melba Allen | 1976 | 15,630 |
|  | 1977 | 1,948 |
|  | 1978 | 835 |

These cases have been consolidated for trial, briefing, and opinion. After concessions, the only issue is whether petitioners were at risk under section 465[2] for certain loans they guaranteed.

The facts have been fully stipulated and are so found.

Petitioners Hugh M. Brand and Elizabeth G. Brand resided in Palos Verdes, Calif., when they filed their petition herein. Petitioners Charles M. Ortiz and Bonita K. Ortiz resided in Salt Lake City, Utah, when they filed their petition herein. All other petitioners resided in Las Vegas, Nev., when they filed their petitions herein.[3]

In September 1973, David Van Wagoner (Van Wagoner) and five brothers in the Ririe family (herein collectively referred to as the Ririe brothers) commenced their farming venture by organizing Jeffco Farms (Jeffco), an Idaho limited partnership. All of the Ririe brothers had experience and technical training in farming. Throughout 1973, 1974, and 1975, both Jeffco and the Ririe brothers, as individuals, purchased land in the Snake River Plain of Idaho. In order to produce crops on this land, it was necessary to drill irrigation wells, install pumps, and purchase farm machinery. Van Wagoner and the Ririe brothers formed Maxim, Inc. (Maxim), an Idaho corporation, to purchase and/or manufacture the requisite equipment and machinery.

In furtherance of their farming venture, Van Wagoner and Wayne Ririe, one of the Ririe brothers, organized 11 limited partnerships (herein the partnerships) during 1973 through 1977. Van Wagoner was the sole general partner and petitioners were some of the limited partners of all the partnerships. Each partnership purchased from Jeffco a portion of its farmland, and each one purchased machinery from Maxim necessary to farm the land which they had acquired. The partnerships pooled their equipment so that each partnership had access to a complete line of machinery and storage facilities. Beginning in 1975 and continuing through the years

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[3]The term "petitioners" as used hereafter does not refer to those petitioners who are parties herein solely by virtue of having filed joint returns.

in issue, all the partnerships and Jeffco entered into joint venture agreements whereby all their farmland and facilities were jointly operated as the "Jeffco Group" (the Jeffco Group).

During the years in issue, the Jeffco Group suffered unexpected losses due to the declining farm economy. In order to help the Jeffco Group's financial situation, Jeffco borrowed $1,010,000 from the Federal Land Bank of Spokane, Wash. (herein Jeffco's loan), pursuant to a recourse note dated August 25, 1975. Jeffco's loan was secured by a mortgage on portions of the land Jeffco had retained in Idaho. On December 31, 1976, nine of the partnerships entered into a loan assumption agreement (herein the assumption agreement) with respect to Jeffco's loan. By the terms of the assumption agreement, the nine partnerships assumed a portion of Jeffco's loan in satisfaction of certain debts they owed to Jeffco.[4] As the general partner, Van Wagoner executed the assumption agreement on behalf of each partnership.

In 1976, Jeffco and three of the partnerships also borrowed a certain sum from the First Security Bank of Idaho (herein the 1976 operating loan) to help their production of crops.[5] Pursuant to provisions contained in the assumption agreement and in related agreements (herein the guaranty agreements), the limited partners of the respective partnerships, in their individual capacities, collectively guaranteed repayment of both Jeffco's loan and the 1976 operating loan. The guaranty agreements were executed on behalf of the limited partners by Van Wagoner pursuant to "Power of Attorney"

---

[4]The following nine limited partnerships assumed a portion of the $1,010,000 Federal Land Bank loan in the amounts as follows:

| Limited partnership | Amount assumed |
| --- | --- |
| Nevada Farm Irrigation | $146,555 |
| Nevada Farm Equipment | 146,555 |
| Nevada Farm Properties | 135,500 |
| Farm Production Properties | 116,273 |
| Farm Production Equipment | 117,073 |
| Farm Production Irrigation | 29,847 |
| Idaho Farms T-1 | 100,800 |
| Idaho Farms T-2 | 83,046 |
| Idaho Farms 76-A | 134,351 |

[5]The three limited partnerships were Idaho Farms T-1, Idaho Farms T-2, and Idaho Farms 76-A.

documents (herein the powers of attorney).[6] The powers of attorney authorized Van Wagoner to do the following:

To sign as guarantor or surety on certain Promissory Notes, or other instruments evidencing indebtedness, made by said David Van Wagoner as Trustee and General Partner of _____
THIS AUTHORITY IS LIMITED TO INDIVIDUAL (AS DISTINGUISHED FROM JOINT AND SEVERAL) LIABILITY ON SECURED FINANCING FOR PARTNERSHIP PURPOSES ONLY AND SAID ATTORNEY IN FACT IS NOT AUTHORIZED TO SIGN AS GUARANTOR OR SURETY ON ANY UNSECURED FINANCING.[7]

The amount each limited partner guaranteed equaled his percentage ownership in his partnership multiplied by the amount of any loans his partnership had either assumed or borrowed.[8]

During the years in issue, petitioners did not make any payments in connection with Jeffco's loan, but certain peti-

---

[6]Petitioner Hugh M. Brand's "Power of Attorney" is not part of the record, but both parties agree that he executed a similar document granting Van Wagoner the same authority.

[7]All of the powers of attorney signed by petitioners were identical except for one minor and insignificant difference in the "Power of Attorney" signed by petitioner Louis J. Hendrickson.

[8]For example, petitioners guaranteed the following amounts of Jeffco's loan assumed by their partnerships as follows:

| | Limited partnership | Amount |
|---|---|---|
| Hugh M. Brand | Nevada Farm Equipment | $10,991.63 (7.5% × $146,555) |
| Foster W. Polley | Nevada Farm Irrigation | $10,991.63 (7.5% × $146,555) |
| William R. Simpson | Nevada Farm Equipment | $3,668.88 (2.5% × $146,555) |
| Louis J. Hendrickson | Farm Production Irrigation | $5,969.40 (20% × $29,847) |
| | Idaho Farms T-2 | $4,152.30 (5% × $83,046) |
| | Idaho Farms 76-A | $2,357.04 (1/57 × $134,351) |
| | Hendrickson total = | $12,478.74 |
| Kenneth L. Cameron | Nevada Farm Equipment | $3,663.88 (2.5% × $146,555) |
| Michael T. Michelas | Nevada Farm Equipment | $3,663.88 |

tioners did make payments in 1979 because their respective partnerships were unable to meet their loan obligations. The record does not indicate whether during the years in issue petitioners made any payments in connection with the 1976 operating loan.

On their returns for the years in issue, petitioners deducted losses of their partnerships in excess of their cash contributions to the partnerships. In his notice of deficiency, respondent determined that since petitioners were not at risk under section 465(b) for the amount of partnerships' loans they guaranteed, they were not entitled to deduct losses in excess of their cash contributions.

The only issue before us is whether petitioners were at risk under section 465(b) for the amount of their partnerships' loans which they guaranteed. Respondent argues petitioners were not at risk under section 465(b) for any of the loans which they guaranteed because they were not personally liable for the repayment of those loans. Petitioners argue they were at risk under section 465(b) because they were personally liable for the repayment of the loans as a result of the guaranty agreements.

Generally, section 465(a)[9] imposes a limitation upon the deductibility of losses arising from an activity specified in section 465(c).[10] This limitation is computed by reference to the amounts a taxpayer is at risk for an activity under section

---

|  |  |  |
|---|---|---|
|  |  | (2.5% × $146,555) |
| Raymond Heard | Nevada Farm Equipment | $10,991.63 |
|  |  | (7.5% × $146,555) |
| Charles M. Ortiz | Teton Farms (not included in agreement) |  |
| Wilmer Allen | Nevada Farm Irrigation | $21,983.25 |
|  |  | (15% × $146,555) |
|  | Farm Production Properties | $5,813.65 |
|  |  | (5% × $116,273) |
|  | Allen Total        = | $27,796.90 |

[9]Sec. 465 was added to the Code by Pub. L. 94–455, 90 Stat. 1531, the Tax Reform Act of 1976, and it is applicable to taxable years beginning after Dec. 31, 1975.

[10]We note that, although sec. 465(a) makes no reference to partners or partnerships, it is clear that sec. 465 was intended to apply to partners and partnerships. See *Peters v. Commissioner*, 77 T.C. 1158, 1163 (1981). Therefore, petitioners are subject to the limitations of sec. 465.

465(b). One of the enumerated activities in section 465(c) is farming. The parties agree petitioners' limited partnerships were engaged in farming activities within the meaning of that section. Thus, resolution of the issue herein depends solely on whether and to what extent petitioners were at risk with respect to their partnerships' farming activities as defined in section 465(b).[11]  Section 465(b) provides that in order for petitioners to have been at risk with respect to the loans in question, they had to be either personally liable for repayment of the loans or have pledged property, other than property used in the farming venture, as security for the loans. Sec. 465(b)(2). Since petitioners did not pledge "other property" as security, the only question is whether they were personally liable for repayment of the loans.

Petitioners first argue they were personally liable because they assumed all of the loans in question. We disagree. Pursuant to the powers of attorney, Van Wagoner was authorized only to sign loans on behalf of petitioners as guarantors or sureties of their partnerships' indebtedness. Van Wagoner was in no way authorized to assume loans on petitioners' behalf. Thus, petitioners' argument that they assumed the loans is totally without merit.

Petitioners next argue that pursuant to the guaranty agreements, they became personally liable on the loans within the meaning of section 465(b)(2). Since section 465(b) does not specifically refer to "guarantors," we must turn to the

---

[11]Sec. 465(b) provides, in relevant part, as follows:

SEC. 465 (b). AMOUNTS CONSIDERED AT RISK.—

(1) IN GENERAL.—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—

(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

(B) amounts borrowed with respect to such activity (as determined under paragraph (2)).

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

legislative history of section 465 for guidance. Section 465 was enacted in order to combat what Congress perceived to be an increasing incidence of abuses in tax shelters. Congress' intention was to limit a taxpayer's losses in certain activities to the amount he was economically at risk in the activity. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 85. As is clearly indicated by the Senate report, a taxpayer is not to be considered at risk for any amount borrowed if he is protected against economic loss which he may suffer:

Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or *if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person.* [1976-3 C.B. (Vol. 3) 87. Emphasis added.]

A guaranty is an undertaking or promise on the part of the guarantor which is collateral to a primary or principal obligation on the part of another and which binds the guarantor to perform in the event of nonperformance by the primary obligor.[12] *Industrial Inv. Corp. v. Rocca*, 100 Idaho 228, 596 P.2d 100 (1979); *Daly v. Del E. Webb Corp.*, 96 Nev. 359, 609 P.2d 319 (1980). A guarantor has a remedy against the primary obligor to recover any amounts he has to pay to the creditor. *Mack Financial Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993 (1980). See also *Austad v. United States*, 386 F.2d 147, 151 (9th Cir. 1967); *Putnam v. Commissioner*, 352 U.S. 82, 85 (1956). Since a guarantor is entitled to reimbursement from the primary obligor, it is clear that Congress did not intend that a guarantor of a loan is personally liable for repayment of the loan within the meaning of section 465(b)(2)(A). Thus, we conclude petitioners were not personally liable under section 465(b)(2) for the repayment of the loans they guaranteed.[13]

---

[12]Generally, under common law, a guaranty agreement is governed by the law of the State where it was executed unless performance is intended to take place elsewhere. See *Equitable Trust Co. v. Bratwursthaus Management Corp.*, 514 F.2d 565 (4th Cir. 1975); *Leeds v. Whitney National Bank of New Orleans*, 374 F.2d 500 (5th Cir. 1967); *Hope v. First Nat. Bank & Trust Co.* , 198 La. 878, 5 So. 2d 138 (1941). Petitioners do not dispute respondent's contention that either Idaho or Nevada law applies. Unfortunately, the record does not set forth sufficient facts for us to make this determination. Nevertheless, both Idaho and Nevada, as well as the common law, follow the same general rules of guaranty law.

[13]On this point, see sec. 1.465-6(d), Proposed Income Tax Regs., 44 Fed. Reg. 32238 (June 5, 1979).

Petitioners' final argument is that they waived any statutory protection they had as limited partners by signing the guaranty agreements. Thus, petitioners contend they were personally liable for repayment of the loans in the same manner as the general partners. For the following reasons, we reject this contention.

Whether a limited partner is liable as a general partner is a question which must be analyzed under State law. Generally, under common law, a partnership is governed by the law of the State where it was organized. See *Nashville City Bank & Trust Co. v. Massey*, 540 F. Supp. 566, 575 (M.D. Ga. 1982); *Gilman Paint & Varnish Co. v. Legum*, 197 Md. 665, 80 A.2d 906 (1951). Once again, the parties have failed to set forth sufficient facts concerning where the partnerships were organized. Some of the partnerships used an Idaho address and some used a Nevada address on their tax returns for the years in issue. Since there is no indication the partnerships were organized elsewhere, we will look to the law of both of these States. Fortunately, during the years in issue, both States followed the Uniform Limited Partnership Act.[14]

The distinctive characteristic of a limited partnership is that a limited partner is not liable for the debts of the partnership in excess of his capital contribution. Idaho Code secs. 53–201, 53–207 (1979); Nev. Rev. Stat. secs. 88.020, 88.080 (1979). A limited partner is liable as a general partner if, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.[15] Idaho Code sec. 53–207 (1919); Nev. Rev. Stat. sec. 88.080 (1931). There is no basis for concluding that by signing the guaranty agreements petitioners thereby became involved in the control of their partnerships' businesses. Thus, there is no merit to their argument that they became personally liable for the repay-

---

[14]In 1982, Idaho's Uniform Limited Partnership Law, enacted in 1919, was repealed, and Idaho's Limited Partnership Act was enacted. All references herein to the Idaho Code are made in respect to Idaho's Uniform Limited Partnership Law enacted in 1919 and as amended and in effect during the years in issue.

[15]The only other circumstance under which a limited partner may be liable as a general partner is if his surname appears in the partnership name. Idaho Code sec. 53–205 (1919); Nev. Rev. Stat. sec. 88.060 (1931).

ment of the partnerships' loans in the same respect as the general partners.

Accordingly, for the above reasons, we sustain respondent's determination that petitioners were not at risk under section 465(b) for the amount of loans which they guaranteed.[16]

To reflect concessions and the foregoing,

*Decisions will be entered under Rule 155.*

---

[16]Respondent further argues petitioners were not at risk for the loans in question because the lender had an interest in the farming activities, other than an interest as a creditor. Sec. 465(c)(3)(A). It is unnecessary for us to address this issue in light of our holding that petitioners were not at risk under sec. 465(b) for the amount of loans they guaranteed.