WALTER F. AND BETTY E. BARTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barton v. Commissioner
Docket No. 20553-85
United States Tax Court
T.C. Memo 1988-396; 1988 Tax Ct. Memo LEXIS 425; 55 T.C.M. (CCH) 1709; T.C.M. (RIA) 88396; August 25, 1988
James Arogeti,Henry G. Zapruder,Roger A. Pies, and David J. Fischer, for the petitioners. Joel E. Helke,Kathleen E. Whatley, and Pamela V. Gibson, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge:[1] Respondent determined deficiencies in petitioners' *426 income tax and additions to tax for the years and in the amounts as follows: Section
Section
Section
Tax Year Ended
Income Tax
6653(a)(1)
6653(a)(2)
6659
Dec. 31, 1981
$ 112,411
$ 5,621
applies
$ 17,509
Dec. 31, 1982
135,051
6,753
applies
33,449
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision whether petitioners were at risk within the meaning of section 465(b)(4)[2] with respect to the Installment Note and the Installment Note Amendment given by Walter F. Barton as a part payment of the purchase price of data processing equipment from St. Joseph Equity Corporation. [3]
All of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, *427 who resided in Atlanta, Georgia at the time of the filing of their petition in this case, filed joint Federal income tax returns for the years in 1981 and 1982 with the Internal Revenue Service Center in Atlanta, Georgia. Walter F. Barton (petitioner) was President and Chairman of the Board of Computer Center of the South, Inc., during the years here at issue. In November, 1981, petitioner purchased data processing equipment (the Equipment) from St. Joseph Equity Corporation (Equity). The Equipment had been purchased by Equity from St. Joseph Leasing Corporation (Leasing). Leasing had purchased the Equipment and leased it to TRW, Inc. (TRW) prior to selling it to Equity. Equity and Leasing were wholly owned subsidiaries of St. Joseph Lease Capital Corporation (Capital) during the years here in issue. Fifty-one percent of the stock of Capital was owned by St. Joseph Agency, Inc. (St. Jo Parent), now known as St. Joseph Bancorporation, Inc. The remaining 49 percent of the stock of Capital was owned beneficially by Michael V. Jennings (Mr. Jennings). St. Jo Parent was (and St. Joseph Bancorporation, Inc. is) a publicly owned bank holding company, regulated by the Federal *428 Reserve System. Capital, Equity, and Leasing were organized by St. Jo Parent and Michael Jennings in 1978. St. Jo Parent applied to the Federal Reserve System for approval of entry into a nonbanking activity at the time Capital, Equity and Leasing were formed. This application was approved on October 2, 1978. Mr. Jennings was President of Capital, Leasing, and Equity during the years at issue and acted on behalf of Equity and Leasing in connection with the transaction involved in this case. Both Equity and Leasing were engaged in computer leasing transactions that have similar structure to the structure of the transaction here involved. Mr. Jennings, before becoming the President of Capital, Leasing, and Equity, was President of a company engaged in computer leasing. Over the period since its formation in 1978, Mr. Jennings has directed Equity and Leasing and has entered into numerous transactions similar to the transaction entered into by petitioners. [4]
TRW, was at all times pertinent herein, a publicly held *429 corporation, the stock of which was traded on the New York Stock Exchange. In 1981 TRW was listed as number 70 of the 500 largest corporations according to Fortune Magazine (May, 1981 edition). Petitioner purchased the Equipment from Equity for $ 700,000 pursuant to a Purchase Agreement and Bill of Sale, Petitioner paid $ 20,000 in cash, $ 110,000 by a Promissory Note and Security Agreement, and $ 570,000 by an Installment Note, secured pursuant to the Security Agreement for the equipment. After a small interest payment in 1981, the Installment Note called for 96 monthly payments of $ 10,102.60. The lease from petitioner as lessor, with Equity as lessee, was for an initial term of 96 months commencing the first day of December 1981, at a monthly rental of $ 10,535.93. It provided lessee with a right of renewal for 36 months. The Installment Note dated November 25, 1981, provided in part as follows: Seller agrees, for itself and its successors and assigns and any holder hereof, that notwithstanding anything to the contrary contained herein (a) the Buyer's Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment *430 securing this Installment Note, or any other use or sale of the Collateral, and (b) the Seller shall have no right to satisfy any of the Buyer's Obligations out of any other property of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of the Obligations. THIS INSTALLMENT NOTE IS SECURED BY A SECURITY AGREEMENT OF EVEN DATE HEREWITH. Petitioner leased the Equipment to Equity pursuant to a Lease Agreement, assigned to Equity all his rights under the lease between petitioner and Equity; Equity assigned to Leasing its rights in the lease between petitioner and Equity; Equity assigned its interest in the lease with TRW to petitioner; and petitioner assigned his interest in the lease with TRW to Equity. On March 16, 1982, the Installment Note was assigned by Equity to Leasing and on July 20, 1982, the Installment Note was assigned by Leasing to Citicorp Industrial Credit, Inc. pursuant to a Purchase and Security Agreement. UCC Financing Statements, Forms UCC-1, were filed with respect to the Installment Note and this assignment. On December 15, 1982, petitioner and Equity executed an *431 amendment to the Installment Note and Security Agreement (herein referred to as the "Amendment"). The Amendment provided as follows: The Buyer and Seller agree to amend the above referenced Installment Note and Security Agreement as follows: 1. The Buyer and Seller hereby agree to amend the above referenced Installment Note and Security Agreement such that the definition of the Buyer's Obligations, as such is used solely in the paragraph contained on page four of the Installment Note and Security Agreement which commences with the following phrase: "Seller agrees, for itself and its successors and assigns . . .", shall no longer mean: "all liabilities of the Buyer to the Seller arising under the Installment Note and Security Agreement" but shall instead mean: "all liabilities of the Buyer to the Seller which are in excess of the following amounts on and continuing after the specified dates: December 15, 1982
$  91,000
December 15, 1983
201,000
December 15, 1984
299,000
December 15, 1985
383,000
December 15, 1986
305,000
December 15, 1987
216,000
December 15, 1988
113,000
December 15, 1989
5,000
(which amounts, as applicable, are hereinafter *432 referred to as the "Buyer's Recourse Obligation"), arising under the Installment Note and Security Agreement." 2. In consideration of the Buyer entering into this Amendment and agreeing to be fully liable on a recourse basis for the Buyer's Recourse Obligation under the above referenced Installment Note and Security Agreement, the Seller and its Assignee: (i) reconfirm for the benefit of the Buyer, as regards that portion of the Buyer's Obligations which are in excess of the Buyer's Recourse Obligation, that: (a) such excess Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral; and (b) the Seller shall have no right to satisfy any of the Buyer's excess obligations under the Installment Note or Security Agreement out of any other property of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of such excess Obligations; and (ii) agree that if either: (a) the corporate bond rating of the lessee to whom the Seller is leasing the Equipment as published by Moody's *433 Investors Service, Inc. falls below such lessee's rating as of the Commencement Date of the Original Term of the Lease; or (b) the net worth of the lessee to whom the Seller is leasing the Equipment falls below such lessee's net worth as set forth in the most recent audited financial statement available as of the Commencement Date of the Original Term of the Lease, the Buyer may rescind this Amendment, in whole or in part, by tendering written notice to the Seller by registered mail, return receipt requested. 3. All other terms and conditions of the above referenced Installment Note and Security Agreement remain unchanged. At the time of the transaction, petitioners, Equity, Leasing, Capital, and Mr. Jennings owned no stock interest in Moody's Investor Service, Inc. or TRW. Neither petitioners nor Mr. Jennings was an officer or director of TRW or Moody's Investor Service, Inc. or related to any such office or director. Petitioner, Mr. Jennings, Capital, Equity and Leasing believed that, although possible, the chance of occurrence of an event which would give rise to petitioners' rights under paragraph 2(ii) of the Amendment was remote. As part of the transaction, Mr. Jennings *434 provided petitioner with an annual report for TRW for the year 1980. At the time of submission of this case petitioner had not exercised his rights under paragraph 2(ii) of the Amendment. The scheduled decreases in the amount of recourse liability pursuant to the Amendment correspond to scheduled reductions in the principal amount due under the Installment Note. With respect to the St. Joseph Leasing Activity, petitioner reported rental income and claimed total deductions (interest and depreciation), and loss as follows: Rental Income
Total Deductions
Loss
1981
$  10,536
$ 105,000
$  94,464
1982
126,431
235,134
108,883
Respondent in the statutory notice of deficiency disallowed the claimed losses on the grounds that the transaction was entered into by petitioners without business purpose; and no economic substance; and no profit motive. Respondent, in an Amendment to Answer filed June 11, 1987, alleged that for taxable year 1982 petitioners were not at risk within the meaning of section 465(b)(4) because at the close of taxable year 1982 they were protected against loss through a stop loss agreement or other similar arrangement. *435 It is petitioner's position that paragraph 2(ii) of the Amendment does not constitute a stop loss agreement or other similar arrangement pursuant to section 465(b)(4). It is respondent's position that paragraph 2(ii) of the Amendment does constitute a stop loss agreement or other similar arrangement pursuant to section 465(b)(4); that, as a consequence, petitioner is not "at risk" with respect to the Installment Note and the Amendment; and that petitioner's deductions are limited to the amounts for which he is "at risk," i.e., $ 20,000 in cash and the $ 110,000 Promissory Note. Petitioner contends that the likelihood of escape from risk under the provisions of paragraph 2(ii) of the Amendment was so remote that he was not effectively protected from his recourse obligation. Respondent relies upon Brand v. Commissioner,81 T.C. 821 (1983); Capek v. Commissioner,86 T.C. 14 (1986); and Porreca v. Commissioner,86 T.C. 821 (1986), in support of his position that paragraph 2(ii) of the Amendment permits petitioner to convert his recourse liability to nonrecourse and therefore constitutes a stop loss agreement or other similar *436 arrangement within the meaning of section 465(b)(4). [5]
*437 It is respondent's position that this Court concluded that the taxpayer in each of these cases was not at risk because under all the facts present the taxpayer could not suffer an economic loss. Petitioner does not question that the legal test of whether he was at risk is whether he is effectively protected against loss. However, he distinguishes Brand v. Commissioner,supra,Capek v. Commissioner,supra, and Porreca v. Commissioner,supra, from the instant case. Petitioner contends that an examination of the substance of the borrowing arrangement in the instant case shows that he was not effectively protected from economic loss by the provisions of the Amendment. Petitioner makes numerous arguments in support of his contention that he was at risk with respect to the Installment Note as amended. [6] We have considered all these arguments, but have concluded that the principles of the Brand,Capek, and Porreca cases, among others, support a holding that petitioner was not at risk under the Amendment due to the existence of a stop loss agreement or other similar arrangement. *438 In Brand v. Commissioner,81 T.C. 821, 828 (1983), respondent disallowed the limited partner-taxpayers' deductions for partnership losses in excess of their cash contributions on the ground that they were not at risk for the amounts of partnership loans which they had guaranteed. We rejected the taxpayers' arguments that they had assumed the loans. We concluded instead that the authority given to the general partner was merely to guarantee and not assume loans on the limited partners' behalf. We also rejected the argument that the taxpayers had waived the statutory protection provided to limited partners so that they would become personally liable as general partners. Finally, we rejected the taxpayers' argument that they became personally liable within subsection 465(b) pursuant to the guaranty agreements. Because "guarantors" were not referred to in subsection 465(b), we examined the legislative history behind section 465 and noted that: Congress' intention was to limit a taxpayer's losses in certain activities to the amount he was economically at risk in the activity. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 85. As is clearly indicated *439 by the Senate report, a taxpayer is not to be considered at risk for any amount borrowed if he is protected against economic loss which he may suffer. [Brand v. Commissioner,81 T.C. at 828.]
We then examined the nature of a guaranty as being an -- undertaking or promise on the part of the guarantor which is collateral to a primary or principal obligation on the part of another and which binds the guarantor to perform in the event of nonperformance by the primary obligor. [Fn. ref. omitted. Citations omitted.] A guarantor has a remedy against the primary obligor to recover any amounts he has to pay to the creditor. [Citations omitted.] Since a guarantor is entitled to reimbursement from the primary obligor, it is clear that Congress did not intend that a guarantor of a loan is personally liable for repayment of the loan within the meaning of section 465(b)(2)(A). Thus, we conclude petitioners were not personally liable under section 465(b)(2) for the repayment of the loans they guaranteed. [Brand v. Commissioner,81 T.C. at 828. Citations *440 omitted. Fn. ref. omitted.] Petitioner dismisses the applicability of Brand, contending that its distinctions between primary and secondary liability are irrelevant where, as here, petitioner is primarily and directly obligated and has no right to subrogation. It is true that in this case there was no primary obligor on the note to whom petitioner could look for reimbursement if he was called upon to make good on his recourse liability. However, the actual holding in Brand is that the congressional intent of section 465(b)(4) is that a taxpayer who is protected from economic loss will not, for purposes of that section be considered at risk. It is this principle which we consider pertinent to the situation in this case. Capek v. Commissioner,86 T.C. 14 (1986), involved deductions claimed by investors in a coal-mining shelter. These investors were required to make yearly advance royalty payments in specified amounts. In the event no coal was mined, the investors were entitled to receive penalty payments in amounts substantially equal to the payments they were required to make. We concluded that the net effect of such an arrangement was that the *441 taxpayers would never personally be economically at risk. Petitioner disputes the applicability of Capek v. Commissioner,86 T.C. 14 (1986), to this case. He argues that there is no assertion that he would be entitled to reimbursement for his recourse liability and that protection was not always available to him. We reject these contentions for several reasons. First of all, in our view there is not and never would be any ultimate recourse liability on petitioner because the 2 (ii) provision of the Amendment allows him to avoid this possibility. Therefore, the question of reimbursement becomes irrelevant. In addition, petitioner misses the point when he argues that the protection would only arise in "remote" circumstances. It is this "remote possibility" which defeats his claim for at-risk status. We thus reject the arguments that his remote possibility of protection is such that he would not be considered effectively protected. The "remote possibility" of protection becomes effective under any circumstance where such protection might be needed. In our opinion, the net effect of the Amendment is to protect petitioner from economic loss because the *442 only circumstance under which he realistically would be called upon to pay is where the end-user, TRW, would not or could not pay on its obligation and that is exactly the circumstance in which petitioner could opt out of his recourse liability. Unless there was a reduction in TRW's net worth from that shown in its 1980 financial statement it would be able to or could be forced to pay the rent under its agreement and it was this rent that paid petitioner's note. Also, any default or refusal to pay by TRW would cause its bond rating to fall. Porreca v. Commissioner,86 T.C. 821 (1986), involved the taxpayer's purchase of a total of six episodes of two different television programs. As part of the purchase price, investors executed what were on their face "recourse" promissory notes. During the initial 5-year period of the notes only nominal interest payments were required. After 5 years, these recourse notes provided an option to convert to nonrecourse liability upon the payment of a $ 1,000 per note conversion fee. The taxpayers argued that regardless of the conversion feature in later years, during the years in issue the note provided for recourse liability. *443 Respondent contended the parties never intended the so-called recourse liability to create personal liability, even prior to the time of conversion. According to respondent, this liability was always essentially nonrecourse since during the 5-year recourse period, their liabilities were so insignificant and the restrictions upon conversion so limited that they must be regarded as nonrecourse all along. Therefore, respondent argued that the taxpayer's liabilities should be considered either nonrecourse or covered by a stop loss agreement or other similar arrangement pursuant to section 465 (b)(4). We again examined the legislative history of section 465 and noted that while this legislative history did not -- define specifically what is meant by the words "other similar arrangement," it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable.* * * [Porreca v. Commissioner,86 T.C. at 838. Emphasis supplied.]
We relied, inter alia, upon our then-recent decision in Capek v. Commissioner,supra, *444 which concluded the right to receive penalty payments was an "other similar arrangement" because the net effect was to protect the investors from having to pay. We used a facts and circumstances determination to conclude in Porreca v. Commissioner,supra, that the taxpayer's liabilities should be regarded as nonrecourse and that there was, with respect to those liabilities, an "other similar arrangement." Among the facts found to be significant were the following: only minimal payments were required to keep the notes current in the initial 5-year period; amounts in excess of the annual minimum interest payments representing interest and principal were payable from the net proceeds of distribution; and taxpayer retained the unilateral right to convert upon the payment of $ 1,000 per note after the 5-year period. Based upon the facts here, we reach a similar conclusion. We conclude that the Amendment constituted an "other similar arrangement." The note was initially nonrecourse, by agreement of all the parties involved and was so accepted by Citicorp, the subsequent assignee, in March 1982. Payments of the liabilities were with the rental payments from TRW. *445 In fact, petitioners had assigned their rights to the TRW rental payments to Equity and Equity had assigned its rights to Leasing. The result of these assignments was that Leasing kept the TRW rental payments and Equity's notes to it and petitioners's note to Equity was considered paid. Finally, under paragraph 2(ii) of the Amendment, petitioner had a unilateral right to convert his liability to nonrecourse upon the occurrence of one of the triggering events which would inevitably occur if TRW failed to make a rental payment. The triggering events chosen were directly related to the circumstances under which petitioner would seek to avoid recourse liability and thus paragraph 2(ii) of the Amendment functioned as an other similar arrangement within the meaning of section 465(b)(4). Capek v. Commissioner,supra,Porreca v. Commissioner,supra, and subsequent cases discussed infra.
The taxpayers in Porreca v. Commissioner,supra, argued that the legislative history of section 465 recognized that notes initially recourse which were converted to a nonrecourse basis could be recognized as having at-risk status in *446 the years prior to conversion. In Porreca, we quoted the legislative history which set forth examples of events triggering the right to convert from recourse to nonrecourse status. We pointed out that all these events had substantial economic relationships to the activity involved. In other words the triggering event is a development in the activity which would improve the economic status of the activity to such an extent that recourse on the notes would no longer be needed. In Porreca, we found there was no such economic event in that case to trigger the conversion. Rather, the conversion was at the taxpayer's option, following the payment of minimal interest during the 5-year period, and upon payment of the $ 1,000 per note conversion fee. We stated that in order: To satisfy the substantial economic event requirement, the passage of a stated period of time must be coupled with some actual experience or events which demonstrate or establish some degree of economic viability or success of the underlying activity. * * * [Porreca v. Commissioner,86 T.C. at 841.] *447 In the instant case there is no substantial economic event effecting the economic viability of the sale/leaseback which triggers the conversion right. On the contrary, petitioner's conversion right is triggered under the exact circumstances when he would most likely desire to escape liability. Instead of being triggered by economic improvement of the activity as in the examples in the Committee Reports quoted in the Porreca case, the right of conversion is triggered if the economic viability of the transaction decreases. Petitioner argues that the substantial economic relationship test, and thus Porreca, have no applicability where the avoidance of recourse liability occurs only in unlikely circumstances. Petitioner in effect seeks to confine the application of the substantial economic relationship test to automatic conversion situations. We disagree with this position of petitioner. Porreca by its terms clearly applied an economic viability test to a situation where the taxpayers retained the right or choice to convert. Petitioner contends that the substantial economic event test alluded to in Porreca is applicable where the event whereby a taxpayer may *448 avoid recourse liability is certain to occur and the power to avoid liability is within the taxpayer's control. Petitioner argues that the substantial economic event relationship is of little significance here because "the events necessary to permit avoidance of recourse liability, if avoidance of recourse liability is possible at all, are (1) wholly outside petitioner's control, and (2) very unlikely to occur." Petitioner notes that in Porreca, the event whereby the taxpayer could escape liability -- payment of $ 1,000 per note after 5 years -- was completely within the taxpayer's control and at a time absolutely certain to occur. Petitioner states that in this case he could not escape recourse liability by the payment of a fee. Rather, petitioner contends that his ability to avoid recourse liability would be due to "the occurrence of a remote event, outside of their control and unrelated to the substance of their arrangement." In addition, petitioner argues that, unlike Porreca v. Commissioner,supra, very substantial payments would be made. With respect to the last contention, we note that if events occurred whereby the end user was not making its *449 payments as required pursuant to the sale/leaseback arrangement, petitioner would not be making the substantial payments he claimed would be forthcoming. That would be true unless he choose to retain recourse liability, which he would not be required to do under the circumstances. Thus, in our opinion, the net effect of TRW's not paying -- because they could not or would not -- would be the occurrence of one of the triggering events. Granted, the existence of the triggering events is outside petitioner's control. However, it is petitioner who by his choice retained the option to avoid recourse liability, an action over which he does have control upon the happening of the triggering events. While petitioner argues, and we agree, that the likelihood of those triggering events is remote, it is under those exact circumstances and with the same remoteness that petitioner would choose to avoid recourse liability. We disagree with petitioner's contention that the triggering events are unrelated to the substance of the agreement. The viability of the sale/leaseback is necessarily and ultimately dependent upon the economic stability of the end-user lessee of the equipment. Only upon *450 nonpayment by TRW could Equity under the setup of all the agreements fail to pay petitioner. Actually, as long as TRW paid, Leasing merely kept the money which paid the notes. If TRW would not or could not pay, the circumstances would be such as to result in the occurrence of either or both of the triggering events. Thus, only if the triggering events occurred would petitioner have any liability since at any other time he would have the assurance of being paid and thus of the payment of his notes. As respondent points out, the interpretation of the effective protection standard by the parties hinges upon two different tests. Petitioner argues for a remoteness test, arguing that if the possibility of escaping liability is very remote, petitioner is not effectively protected and is at risk. However, according to respondent, this Court has already stated that the applicable test with which to measure effective protection is "the obligor of last resort." Respondent contends subsequent section 465 cases have refined the standards set forth in Brand,Capek, and Porreca in this regard. The tests used by the Court to determine whether taxpayers had ultimate liability for *451 debt or rather were protected from economic loss, have followed the legislative history's stricture requiring economic risk before entitlement to tax benefit. For instance in Melvin v. Commissioner,88 T.C. 63 (1987), we again examined a personal guaranty to determine economic risk. The taxpayer was a general partner of a partnership which itself purchased an interest in a California limited partnership. The limited partnership interest purchase price was $ 105,000 consisting of $ 35,000 cash and a $ 70,000 recourse promissory note. Taxpayer's share was $ 25,000 cash and $ 50,000 of the promissory note. The limited partnership subsequently obtained from a third-party bank a $ 3,500,000 loan, pledging as security its limited partners' recourse promissory notes which totaled over $ 8,000,000. Respondent contended that the taxpayer's at-risk amount was limited to his pro rata share of the $ 8,000,000. We first considered the question of whether the taxpayer was personally liable so as to be at risk and then looked to whether or not he was protected against loss. We concluded that the taxpayer was personally liable, rejecting respondent's argument that the taxpayer *452 and the other limited partners were not "economically at risk" with respect to the debt obligation of the limited partnership to the bank. We concluded that the taxpayer and the other limited partners were both ultimately and personally liable for repayment of the $ 3,500,000 loan. After concluding that the taxpayer was personally liable, we looked to his protection against loss. Respondent argued that even if the taxpayer was personally liable to pay the bank amounts in excess of his pro rata share of this debt, he would be protected by a right of reimbursement from other limited partners for such excess amounts. In Melvin v. Commissioner,88 T.C. at 75, we refined our personal liability test as follows: The relevant question is who, if anyone, will ultimately be obligated to pay the partnership's recourse obligations if the partnership is unable to do so. It is not relevant that the partnership may be able to do so. The scenario that controls is the worst-case scenario, not the best case. * * * The critical inquiry should be who is the obligor of last resort, and in determining who has the ultimate economic responsibility for the loan, the *453 substance of the transaction controls. [Citations omitted. Emphasis supplied.] The taxpayer in Melvin was under California law entitled to reimbursement from other limited partners if he had to pay amounts in excess of his pro rata share. The taxpayer argued that this right of reimbursement was merely prospective or potential. We rejected his argument because: the test of whether a taxpayer is protected against loss with respect to amounts otherwise at risk is whether the protection (such as a right of reimbursement) is definite and fixed, not whether any payment as a result of the protection is immediate versus prospective. The manner by which the protection is established (whether by binding agreement between the parties or by state law) is not controlling. [Melvin v. Commissioner,88 T.C. at 78.] Thus, because the taxpayer was protected from loss in excess of his pro rata share of the recourse note, some $ 21,812, he was not a risk in an amount greater than that. This was because "it was not contemplated that [the taxpayer] ever would have to pay an amount with respect to the bank loan in excess of his pro rata share thereof." Melvin v. Commissioner,88 T.C. at 79. *454 Similarly, in this case, even if petitioner is personally liable (which is highly debatable, but is not the issue herein), he is protected from loss by the 2(ii) provisions of the Amendment when this Amendment and the Installment Note are considered in their entirety. Just as the taxpayer in Melvin was protected by the definite and fixed obligation of the other limited partners to pay their pro rata share, petitioner is protected from economic loss by the binding agreement set out in the Amendment. Here we conclude that, by agreement of the parties, if petitioner is ever in a position in which he would face economic risk, i.e. -- the worst-case scenario assumption here being that TRW would not or could not pay and that Equity, under its collection obligations under the Note Assignment to Citicorp, would seek payment from petitioner without making its lease payments to petitioner, he could unilaterally act to avoid that liability. Consequently, he is not at risk for the amounts under the recourse note as amended due to the stop loss agreement or other similar arrangement of the 2(ii) provision of the Amendment. He is protected from loss by this provision. Finally in Peters v. Commissioner,89 T.C. 423 (1987), *455 the issue was whether the personal guarantees of certain limited partners of a nonrecourse obligation of their partnership was sufficient to make the taxpayers at risk or whether those guarantees constituted an "other similar arrangement" whereby amounts apparently at risk were in effect protected from economic loss. Most of the limited partnership interests were obtained by a cash contribution and the execution of an investor promissory note. Applying a facts and circumstances determination, we considered the following facts to be pertinent: (1) the institutional lender's (the bank's) loan commitment letter to the partnership "required" limited partners' guarantees but the bank closed without them; (2) those personal guarantees were part of a post-closing requirement, which was not scrupulously enforced; (3) the private placement memorandum advised the limited partners of the requirement of a personal guarantee in order to satisfy section 465; (4) the limited partnership's secured note was nonrecourse both to the partnership and the partners, but provided an option to personally guarantee a portion; (5) the limited partners gratuitously obtained the right to incrementally increase *456 their at-risk amounts, in amounts calculated not to exceed available deductions less capital contributions; and (6) the yearly personal guarantees did not guarantee the entire partnership debt to the bank. Faced with the question of whether the personal guarantees were an "other similar arrangement" we again noted that a taxpayer is not considered at risk for amounts borrowed if protected against risk. Brand v. Commissioner,81 T.C. 821 (1983). Applying New York law, which provided the taxpayer with a right of subrogation against the partnership, we concluded the limited partners' were mere guarantors and thus were not at risk. The subrogation right made Peters v. Commissioner,89 T.C. 423 (1987), distinguishable from Abramson v. Commissioner,86 T.C. 360 (1986), where although nominally a "guarantee," in application the agreement did create personal liability for a pro rata portion of the liability. As we noted in Peters, the guarantees extended to only a portion of the debt which was calculated to the taxpayer's expected tax benefit. In addition "we also [though the bank] would be taken aback to be told that [the *457 partnership] was not the primary obligor on the secured promissory note." Peters v. Commissioner,89 T.C. at 442. Far from being primary and direct obligations of the partners to pay the entire debt, the personal guarantees, having in effect been voluntarily given, were at most lagniappe as far as [the bank] was concerned. [Peters v. Commissioner,supra at 443.] While it is true the Peters taxpayers' chances of recovery under that right might be remote, we further noted that the remoteness of the ability to recover, under a right of subrogation, was no reason to disregard that right for Federal tax purposes. We added: By the same token, one might also say that the likelihood of petitioners' having to make good under their personal guarantees is remote, given the impressive security provided by Datasaab AB's lease guarantee. Petitioners themselves chose the device of guarantees, which for all intents and purposes were gratuitously given, as their means of making an end run around the at risk rules of section 465. They may not now be selective as to which parts of the guarantees are to be legally effective and which are not. *458 [Peters v. Commissioner,89 T.C. at 443.] The record in the instant case, as in the Peters case, shows that any recourse liability of petitioner is remote and it is if this remote possibility occurred that petitioner is protected against loss. The parties by stipulation in this case limited the issue to whether the provisions of the Installment Note and the Installment Note Amendment constitute a stop loss agreement. [7] However, in considering whether petitioner is at risk under the Installment Note and the Amendment, here, as in Peters, the factual situation is very relevant. The facts show that -- (1) Equity and petitioner agreed to and did enter into a legally binding obligation on a nonrecourse basis; (2) This note was subsequently assigned to Citicorp with no requirement of recourse liability; (3) The note was subsequently amended without consideration to become an incrementally recourse obligation, with no such requirement by Citicorp; (4) The incremental increases were calculated not to exceed the available tax benefits; (5) Petitioner was advised prior to entering into the nonrecourse obligation of the need to be at risk for tax *459 purposes; and (6) Petitioner retained within the Amendment the option to avoid recourse liability upon the happening of either of the 2(ii) events. *460 Based upon the facts and circumstances set forth above, we conclude that under the provisions of the Installment Note and the Amendment petitioner was protected from loss. The "remoteness" of his protection from loss does not mitigate the fact that petitioner has chosen to protect himself from economic loss in the worst-case scenario. Peters v. Commissioner,89 T.C. 423 (1987). Where the likelihood of personal liability is remote due to TRW's creditworthiness, concurrent remote likelihood of the protection against loss does not cause that protection not to be effective. We hold under the facts and circumstances here present petitioner was not at risk because he was protected from loss by an "other similar arrangement." Decision will be entered under Rule 155.
Footnotes
1. By order of the Chief Judge, this case was assigned to Judge Scott for opinion and decision. ↩
2. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Among the issues disposed of by the parties were the additions to tax. ↩
4. See, e.g., Offermann v. Commissioner,T.C. Memo. 1988-236 (May 1988) and Johnson v. Commissioner,11 Cl. Ct. 17↩ (1986). 5. Section 465 reads in pertinent part as follows: (b) Amounts Considered at Risk. -- (1) In general. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed amounts. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). * * * (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. ↩
6. Petitioner argues at length that if he rescinded the agreement in accordance with paragraph 2(ii) of the Amendment, the rescission would be only prospective and not retroactive and therefore because at the close of each year here in issue he was at risk since there had not been a rescission at year-end. In view of our conclusion and discussion in this opinion we do not consider it necessary to discuss the various arguments made by the parties in this respect such as whether the parol evidence rule would bar testimony as to the intent of the parties with respect to the provisions and whether "rescind" as used in the arrangement means "rescind" or means "revoke." ↩
7. The parties stipulated in part as follows: The sole issue remaining in dispute is whether petitioner is at risk within the meaning of section 465(b)(4) with respect to the Installment Note and the Installment Note Amendment. This issue was not raised by respondent in the statutory notice of deficiency. It is petitioner's position that paragraph 2(ii) of the Installment Note Amendment does not constitute a stop loss agreement or other similar arrangement pursuant to section 465(b)(4). It is respondent's position that paragraph 2(ii) of the Installment Note Amendment constitutes a stop loss agreement or other similar arrangement pursuant to section 465(b)(4), and that, as a consequence, petitioner is not "at risk" with respect to the Installment Note and the Installment Note Amendment, and that petitioner's deductions are limited to the amounts for which they are "at risk," i.e., $ 20,000 in cash and the $ 110,000 Promissory Note. If the Court finds that Installment Note and the Installment Note Amendment do not constitute a stop loss agreement or other similar arrangement pursuant to section 465(b)(4)↩, the deductions claimed for the St. Joseph Leasing Activity will be allowed in full.